BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
ADAM M. BUCCI (27312)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com
abucci@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW (*pro hac vice forthcoming*)
ANTHONY L. PARKHILL (*pro hac vice forthcoming*)
205 W. Randolph Street, #1630
Chicago, IL  60606
Tel: 312/621/2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| SANDEEP KAPIL, GABRIELA GOMEZ and KIM SALLEN, on behalf of themselves and all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| | **CLASS ACTION** |
| v. | |
| APPLE, INC., | |
| Defendant. | |
| | **JURY TRIAL DEMANDED** |

00220155

Plaintiffs Sandeep Kapil, Gabriela Gomez and Kim Sallen, on behalf of themselves and all others similarly situated, hereby file their complaint against Apple, Inc. ("Apple" or "Defendant"), and in support thereof state:

## INTRODUCTION

1.      Apple authorized and maintained malicious applications in its "App Store" that allowed the theft of personal financial assets while representing that apps in its App Store had been vetted and reviewed by Apple and were safe and secure.

2.      Apple has built a business model that depends not only on selling hardware such as iPhones and iPads but also on providing consumers with a curated selection of applications through the App Store. By maintaining exclusive control over the applications that may be downloaded on Apple devices, Apple has structured its ecosystem so that customers rely on Apple for the perceived safety and reliability of the App Store. Apple has actively and extensively represented to consumers that apps on the App Store are thoroughly vetted, trustworthy, and secure. Apple has actively represented that its App Store apps which are used for cryptocurrency trading come from approved financial institutions and comply with all applicable laws.

3.      These representations foster consumer trust, which, in turn, incentivizes consumers to purchase Apple devices over competing brands. Apple's campaign to promote the safety and trustworthiness of its App Store directly contributes to increased sales of iPhones and other Apple products, as consumers reasonably believe that Apple's devices provide a safer and more secure user experience. Without this assurance of security, fewer consumers would be inclined to purchase Apple devices, as they might perceive other smartphones or tablets as equally secure or better suited to meet their needs.

4.      Apple's assertions regarding the safety and legitimacy of App Store apps thus serve a dual purpose: enhancing the appeal of Apple's ecosystem while driving hardware sales. This is not merely a platform for app distribution but a cornerstone of Apple's competitive advantage in the smartphone and tablet market. Consequently, Apple profits not only from app sales or in-app purchases but also from free apps because Apple profits significantly from the added value that this

00220155

1    perceived security brings to its devices, making the continued representation of app safety integral

2    to Apple's market strategy and business growth.

3         5.    Plaintiffs and Class members relied on Apple's express representations and ongoing

4    and long-standing campaign of representing that its App Store is "a safe and trusted place" when

5    they downloaded applications purporting to be digital asset trading applications called Digicoins,

6    SolLuna, and Forex5. Unknown to Plaintiffs and Class members the Digicoins, SolLuna, and Forex5

7    applications were "spoofing" programs created for the sole purpose of stealing fiat and

8    cryptocurrency by obtaining consumers' account information and thereafter routing Class members'

9    assets to the perpetrators' personal accounts. Not knowing this, and relying on Apple's express and

10   longstanding representations that apps from its App Store had been vetted and were safe and legally

11   compliant, Plaintiffs and Class members downloaded the apps from the Apple App Store.

12   Subsequently, after following instructions contained in the apps to deposit funds, and after what

13   appeared to be legitimate trades and growth of their funds, their Digicoins, SolLuna, and Forex5

14   accounts were frozen and all the money they invested was stolen in a cryptocurrency investment

15   scam known as "pig butchering."[1]

16        6.    Apple's affirmative representations and the general impression that it has cultivated

17   that apps from its App Store could be trusted and were safe and secure because of Apple's rigorous

18   vetting and review process were false and misleading. As a result of Apple's misrepresentations,

19   and its failure to take appropriate corrective or remedial action, Apple has caused Plaintiffs and

20   Class members to download apps created solely for "pig butchering" schemes and hence to suffer

21   significant economic losses. Defendant's conduct is in violation of California's Consumers Legal

22   Remedies Act ("CLRA"), Civil Code § 1750, *et seq.* and California's Unfair Competition Law

23   ("UCL"), Business and Professions Code § 17200, *et seq.*

24

25

---

26   [1]    "Pig butchering" is "named in reference to the practice of fattening a pig before slaughter. It
     is a type of confidence and investment fraud in which the victim is gradually lured into making
27   increasing monetary contributions, generally in the form of cryptocurrency, to a seemingly sound
     investment    before    the    scammer    disappears    with    the    contributed    monies."    *See*
28   https://www.fdicoig.gov/pig-butchering-scams (last accessed Oct. 25, 2024).

00220155

7.     By virtue of this class action, Plaintiffs seek to enjoin Apple's unlawful practices and to require that Apple to compensate Plaintiffs and members of the Class for the losses they have incurred because of its misconduct.

**PARTIES**

8.     Plaintiff Sandeep Kapil is an individual, over 18 years of age, and a resident of the State of California, the County of Riverside.

9.     Plaintiff Gabriela Gomez is an individual, over 18 years of age, and a resident of the State of Texas, the County of El Paso.

10.    Plaintiff Kim Sallen is an individual, over 18 years of age, and a resident of California, the County of San Diego.

11.    Defendant Apple, Inc. is California corporation with its principal place of business at One Apple Park Way, Cupertino, California 95014.

**JURISDICTION AND VENUE**

12.    Jurisdiction is proper under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because, on information and belief, the proposed Class consists of 100 or more members; many of the members are citizens of states that are diverse from the state of Defendant's citizenship; and the amount in controversy exceeds $5,000,000, exclusive of costs and interest.

13.    This Court may exercise personal jurisdiction over the Apple, who has availed itself of the jurisdiction of this Court through acts and omissions, including but not limited to, having its principal place of business in this District, advertising its services in this District, selling products and services to consumers in this District, and by otherwise conducting business in this District; furthermore, various agreements between Apple and the Class select the Courts of this State as the proper forum for all disputes.

14.    Venue is therefore proper in this forum pursuant to 28 U.S.C. § 1391(b), and further, as the Apple is located in this judicial district and/or a substantial part of the acts or omissions giving rise to the claims herein occurred in the same.

1                                    **INTRADISTRICT ASSIGNMENT**

2         15.     Pursuant to Civil L.R. 3-2(c) and (e), assignment to the San Jose Division is proper

3 because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in Santa

4 Clara County, where Apple resides.

5                                   **GENERAL ALLEGATIONS**

6 *Apple and the App Store*

7         16.     Apple is one of the largest mobile and tablet application providers in the world,

8 through its universally known "App Store."

9         17.     Apple describes the App Store to consumers as follows: [2]



App Store

# The apps you love.
# From a place you can trust.

For over a decade, the App Store has proved to be a safe
and trusted place to discover and download apps. But the
App Store is more than just a storefront — it's an innovative
destination focused on bringing you amazing experiences. And
a big part of those experiences is ensuring that the apps we
offer are held to the highest standards for privacy, security, and
content. Because we offer nearly two million apps — and we
want you to feel good about using every single one of them.

22         18.     Apple has worked for decades to build and promote a reputation of providing apps

23 that are safe and can be trusted. Over time, Apple has established an image that its App Store is

24 carefully curated, with each app undergoing a rigorous review to ensure it meets Apple's security

25 standards. This long-standing marketing message has fostered an inherent belief among consumers

26 that apps on the App Store are safe by default.

---

[2]    *App Store*, Apple, https://www.apple.com/app-store/ (last accessed Nov. 15, 2024).

19.    Apple has distinguished itself in the tech industry as a company committed to user privacy and security. Consumers have come to associate Apple products with high standards of protection, further encouraging an assumption that any app available on the App Store is secure and free from fraudulent intent. This association reinforces reasonable consumers' belief that Apple's vetting process extends to protecting them from scams.

20.    Apple exercises exclusive control over app distribution on iOS devices, disallowing alternative app sources or sideloading. This exclusivity suggests to consumers that Apple is confident in its review and vetting process, leading users to believe that Apple has effectively shielded them from unsafe or fraudulent applications by eliminating external sources of apps.

21.    Apple has promoted its App Store's vetting process as a stringent security measure, publicly detailing how apps are reviewed by experts who assess them for malware, privacy concerns, and other security risks. Apple also promotes and represents that its App Store apps which are used for cryptocurrency transmissions or transactions are appropriately licensed and that apps facilitating cryptocurrency ICOs (Initial Coin Offerings) or other futures trading of cryptocurrency come from approved financial institutions and comply with all applicable laws. Given this promotion, a reasonable consumer would assume that apps made available for download are free from fraudulent or malicious intent, especially for highly regulated fields like finance and digital asset trading.

22.    Apple has conveyed to consumers that user safety is a core value, underscored by statements such as "Download with confidence" and assurances that the App Store is a "safe and trusted place." Given the prevalence of these messages, consumers are led to believe that Apple's security and vetting practices are specifically designed to prevent fraudulent schemes like pig butchering scams from being present on the platform.

23.    In 2007, Steve Jobs stated that Apple's mission in creating what would become the App Store was to create "an advanced system which will offer developers broad access to natively program the iPhone's amazing software platform while at the same time protecting users from malicious programs."[3]

---

[3]    Adam Engst, *Steve Jobs's iPhone SDK Letter*, TidBits (Oct. 17, 2007), https://tidbits.com/2007/10/17/steve-jobss-iphone-sdk-letter/.

00220155

24.    In a section titled "App security overview" Apple states:

Apple provides layers of protection to help ensure that apps are free of known malware and haven't been tampered with. Additional protections enforce that access from apps to user data is carefully mediated. These security controls provide a stable, secure platform for apps, enabling thousands of developers to deliver hundreds of thousands of apps for iOS, iPadOS, and macOS—all without impacting system integrity. And users can access these apps on their Apple devices without undue fear of viruses, malware, or unauthorized attacks.[4]

25.    Apple on its App Store further represents:[5]

# Privacy and security.
# Built into everything we do.

**Security for every app.
At every level.**

We ensure that apps come from known sources, are free of known malware, and haven't been tampered with at the time of installation or launch.

Apple additionally promises it is:[6]

///

///

///

///

---

[4]    *See*    https://support.apple.com/guide/security/app-security-overview-sec35dd877d0/web (last accessed Nov. 15, 2024).

[5]    *See App Store*, *supra* n.1.

[6]    *Id.*

# Dedicated to trust and safety.

**Apps must adhere to our guidelines.**

When you download an app, it should work as promised. Which is why human App Reviewers ensure that the apps on the App Store adhere to our strict app review standards. Our App Store Review Guidelines require apps to be safe, provide a good user experience, comply with our privacy rules, secure devices from malware and threats, and use approved business models.

Learn more about the App Store Review Guidelines ↗



# Every week, over 500 dedicated experts around the world review over 100K apps.

26.     Apple represents consumers can "**Download with confidence**." It asserts that on its apps, Apple customers can "**Purchase safely and securely.**" And "**Need a refund? AppleCare has your back.**"

27.     Apple controls what applications may be sold or provided to consumers through the App Store by a vetting process that involves provision of the proposed application's purpose and a copy of the application itself and any relevant source code, users' guides, and software documentation.[7]

///

///

---

[7]     *See, e.g., App Review Guidelines*, Apple Developer, https://developer.apple.com/app-store/review/guidelines (last accessed Oct. 14, 2024).

CLASS ACTION COMPLAINT

28.    As part of Apple's promise that apps from its App Store are vetted for safety and security, it promises that each app on the App Store has met its security standards. The promise that apps on the App Store are rigorously vetted fosters and results in consumer trust of Apple apps. And in Apple's words: "Customer trust is a cornerstone of the App ecosystem. Apps should never prey on users or attempt to rip off customers…"[8] According to Apple, "[t]he guiding principle of the App Store is simple—we want to provide a safe experience for users to get apps…"[9]

29.    According to Apple, it achieves its guiding principle of providing customer safety and establishing a cornerstone of consumer trust in its apps and the App Store, "by offering a highly curated App Store where every app is reviewed by experts …. We also scan each app for malware and other software that may impact user safety, security, and privacy. These efforts have made Apple's platforms the safest for consumers around the world."[10]

30.    Apple has specific security standards for cryptocurrency exchange apps as follows:[11]

3.1.5 Cryptocurrencies:

…

(iii) Exchanges: Apps may facilitate transactions or transmissions of cryptocurrency on an approved exchange, provided they are offered only in countries or regions where the app has appropriate licensing and permissions to provide a cryptocurrency exchange.

(iv) Initial Coin Offerings: Apps facilitating Initial Coin Offerings ("ICOs"), cryptocurrency futures trading, and other crypto-securities or quasi-securities trading must come from established banks, securities firms, futures commission merchants ("FCM"), or other approved financial institutions and must comply with all applicable law.

(v) Cryptocurrency apps may not offer currency for completing tasks, such as downloading other apps, encouraging other users to download, posting to social networks, etc.

---

[8]    *Id.*
[9]    *Id.*
[10]   *Id.*
[11]   *Id.*

00220155

31.     Defendant represents that as part of its vetting and review process:[12]

Apps that provide services in highly regulated fields (such as banking and financial services, healthcare, gambling, legal cannabis use, and air travel) or that require sensitive user information should be submitted by a legal entity that provides the services, and not by an individual developer.

32.     Apple also promises immediate correction if issues occur. Apple represents:

In a case where an app makes it into the App Store but is then later discovered to violate guidelines, Apple works with the developer to quickly resolve the issue. In dangerous cases, involving fraud and malicious activity, the app is immediately removed from the App Store and users who downloaded the app can be notified of the app's malicious behavior. [13]

33.     Apple's representations of safety and security in the applications offered in the App Store have been made continuously for almost two decades and were a focal point of widespread advertising and marketing representations made by Apple.

34.     Apple has successfully cultivated the impression that its products and the apps it vets and makes available in the App Store are safe and trustworthy. As described in an article published on February 1, 2023, about illicit pig butchering apps making their way into the Apple App Store, the "presence of the apps in the App Store made the ruse all the more convincing."[14] Researchers from the cybersecurity firm SophosLabs also published an article about pig butchering apps being available in the App Store, stressing that "If criminals can get past these checks [Apple purports to conduct], they have the potential to reach millions of devices. This is what makes it more dangerous for [scam app] victims, as most of those targets are more likely to trust the source if it comes from the official Apple App Store."[15]

---

[12]     *Id.*
[13]     *Supra* n.4.
[14]     Dan Goodman, "Pig-butchering scam apps sneak into Apple's App Store and Google Play," arstechnica (Feb. 1, 2023), available at https://arstechnica.com/information-technology/2023/02/pig-butchering-scam-apps-sneak-into-apples-app-store-and-google-play/ (last accessed Oct. 25, 2024).
[15]     Jagadeesh Chandraiah, "Fraudulent 'CryptoRom' trading apps sneak into Apple and Google app store," Sophos News (Feb. 1, 2023), available at https://news.sophos.com/en-us/2023/02/01/fraudulent-cryptorom-trading-apps-sneak-into-apple-and-google-app-stores/ (last accessed Oct. 25, 2024).

9

00220155

35.     Apple's business model and sales of iPhones and iPads depends upon the App Store applications being safe and secure for Apple customers.

36.     That is because Apple customers have no other practical or convenient manner in which to download applications for their iPhones or iPads, as Apple maintains rigorous control over applications that can be placed on their devices. If App Store applications are not perceived to be safe, the sales of iPhones and iPads will be negatively impacted.

37.     Even when Apple does not directly profit from an application downloaded from the App Store, drawing consumers to its selling forum, as opposed to other fora, has considerable business advantage to Apple, as it encourages consumers to purchase Apple products and dissuades consumers from purchasing other devices.

38.     Because Plaintiffs knew, or at least thought they knew, that Apple thoroughly reviews applications before it allowed them on the App Store, and in reliance on Apple's representations that App Store apps are safe and secure, Plaintiffs purchased Apple hardware (i.e., iPhones and iPads) and downloaded from the App Store one or more of the applications at issue here—Digicoins, SolLuna and Forex5.

39.     The fraudsters that perpetrated the fraud against Plaintiffs and Class members through the App Store did so specifically because the app being in the App Store would lend credibility to the scheme. The fraudsters knew that Apple advertises that App Store as being a safe and trustworthy platform, and they used those representations to their advantage in order to carry out the fraud.

***Digital Asset Frauds***

40.     With Apple's representations in mind, Plaintiffs downloaded apps reasonably trusting that the apps would be safe, legitimate, and suitable for conducting secure financial transactions. Instead, Plaintiffs were met with digital asset fraud, finding themselves victims of schemes that Apple's promises of safety should have prevented.

41.     Fraudsters can carry out these digital asset frauds in different ways. One common mechanism is to "claim to invest customers' funds in proprietary crypto trading systems or in

00220155

1    'mining' farms. The fraudsters promise high guaranteed returns (for example, 20-50%) with little

2    or no risk."[16]

3          42.    Fraudsters can create fake "trading" platforms in which they convince persons to

4    deposit money in what they believed was their own account under their control, often starting with

5    small amounts and building up to higher and higher numbers, promising the users that they are

6    trading their money and achieving high returns.[17] In reality, "no trading actually [takes] place."[18]

7    Any money deposited into the platform is stolen by the scammers. "When [victims] try to withdraw

8    [their] earnings, suddenly there [is a] problem[]," or they are told they must pay out-of-pocket to

9    cover exorbitant undisclosed fees or fake taxes.[19]

10          43.    These cryptocurrency scams are extremely prevalent. The FBI recently reported that

11    the total amount of money lost in these frauds in 2023 was over $5.6 billion.[20] Investment scams,

12    such as the ones discussed above and at issue here, "accounted for 71% of all crypto-related losses"

13    in 2023.[21] The U.S. Secret Service has warned that these types of frauds are of "national interest."[22]

14          44.    Sophisticated digital actors, such as Apple, are well aware of the threat of these

15    schemes. Apple knew, or should have known, that these types of frauds exist and should have

16    protected Plaintiffs and Class members against these types of frauds. Despite representations that

17    Apple takes App Store security seriously, that its customers can trust what is available in the App

18    Store, and that App Store apps used to trade cryptocurrency meet all relevant legal requirements,

19

20    [16]    *Investor Alert: Watch Out for Fraudulent Digital Asset and "Crypto" Trading Websites*,
       Commodity Futures Trading Commission,
21    https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/watch_out_for_digital_fraud.html#
       :~:text=Be%20wary%20of%20anyone%20who,that%20is%20difficult%20to%20understand. (last
22    accessed Nov. 15, 2024).
       [17]    *See Digital Asset Frauds*, Commodity Futures Trading Commission,
23    https://www.cftc.gov/LearnAndProtect/digitalassetfrauds (last accessed Oct. 10, 2024).
       [18]    *Id.*
24    [19]    *Id.*
       [20]    Hannah Lang, *Losses from Crypto Scams Grew 45% in 2023, FBI Says*, Reuters (Sept. 9,
25    2024 3:16pm CDT), https://www.reuters.com/technology/losses-crypto-scams-grew-45-2023-fbi-
26    says-2024-09-09/.
       [21]    *Id.*
27    [22]    *Combating the Illicit Use of Digital Assets*, United States Secret Service,
28    https://www.secretservice.gov/investigations/digitalassets (last accessed Oct. 11, 2024).

00220155

1    Apple allowed these fraudsters to place their apps for download in the App Store and caused great

2    harm to Plaintiffs and Class members.

3    ***Plaintiff Sandeep Kapil's Experience***

4    45.    In August 2023, Plaintiff Kapil joined an online investment discussion group whose

5    purported objective was to share stock recommendations, investment strategies and to leverage the

6    combined investment resources of the group. At the behest of the group leader, an individual using

7    the name Kevin Wilson, a claimed financial expert who professed to sport multiple degrees and a

8    prestigious employment history, the Wilson discussion group expanded into trading cryptocurrency.

9    46.    Kapil and other group members were encouraged to join the supposed

10   cryptocurrency trading platform called Digicoins and utilize the $200 to $800 provided by the

11   exchange to start trading.  Kapil was told to download the Digicoins app only from the Apple App

12   Store or the Google Play Store.

13   47.    Kapil has been an avid user of Apple products for more than two decades. He trusted

14   apps from the App Store because of his experience with Apple products, his experience downloading

15   and using other apps on the App Store, and the overall impression Apple has cultivated among its

16   customers—that apps on the App Store are vetted, safe, and trustworthy. This confidence arose from

17   Apple's long-standing commitment to marketing the App Store as a secure platform, where all apps

18   meet rigorous safety standards. He was also assured by Apple's representations on its App Store

19   that its apps could be trusted and were secure and safe as alleged above. In reliance on this

20   impression Apple has cultivated over time, including Apple's representations regarding the safety

21   and security of App Store apps and based on his belief that the Digicoins app downloaded from

22   Apple's App Store was safe and secure, Kapil downloaded Digicoins from the App Store in or

23   around the month of August, 2023, and began transferring money and buying cryptocurrency he

24   believed he could use to conduct legitimate digital trades on the Digicoins app. Kapil downloaded

25   the Digicoins app onto his iPhone XR that he purchased from Apple near the end of 2018 for

26   approximately $1,000. Kapil would not have purchased his iPhone or spent as much money on the

27   iPhone if he had known the truth about Apple's representations that its apps were not safe or

28   trustworthy.

12

00220155

48.     Kapil's initial deposits were in relatively small amounts. Before he began transferring larger amounts to Digicoins he looked for yet additional assurance from Apple regarding the legitimacy and safety of the Digicoins app. To this end, Kapil reviewed Apple's guidelines and review process for apps available from the App Store, including the particular standards Apple purportedly requires for cryptocurrency exchange apps as alleged above. Apple's representations regarding the safety and security of apps on its App Store further convinced Kapil the Digicoins app was safe for his investments. He began to deposit in larger amounts and to participate—so he believed—in legitimate Initial Coin Offerings (ICOs). Kapil's reliance on Apple's representations was reasonable because the representations he relied on concern the safety and security of apps from the App Store—the "guiding principle" of the App Store according to Apple—and Kapil relied upon Apple's representations for these purposes.

49.     By the end of January 2024, Kapil's Digicoins account had apparently increased from his investment amount of approximately $1,236,935 to over $1,465,991. But then, in early February 2024, Kapil's Digicoins account was suddenly locked and his assets in his account frozen. A few days later, the Digicoins app was non-functional and non-responsive. Kapil later discovered the Digicoin's app was not legitimate or in compliance with legal requirements, contrary to Apple's representations, it was not safe and could not be trusted, and it did not comport with Apple's represented standards and vetting processes for a cryptocurrency app. The Digicoins app was part of a "pig butchering" scam and the more than $1,236,000 that Kapil had deposited was gone. As a direct result of Apple's process for reviewing the Digicoins app on its App Store and Kapil's reasonable reliance on Apple's representations assuring him the app had been vetted, was safe and could be trusted, Plaintiff Kapil was injured and lost over a million dollars. Contrary to Apple's representations and stated processes for correction, Kapil and other users of Digicoins were never notified by Apple that Digicoins was a dangerous app used for fraud and malicious activity. Because of the false and deceptive material misrepresentations at issue, Plaintiff Kapil also overpaid for his iPhone.

00220155

*Plaintiff Gabriela Gomez's Experience*

50.    In approximately August 2023, Plaintiff Gomez joined two online investment discussion groups whose purported objectives were to share stock recommendations, investment strategies and to leverage the combined investment resources of the group. Gomez had been educating herself by various means regarding stock investments and trading of digital assets and the online discussion groups were part of this process. At the behest of one of the group leaders, an individual using the name Kevin Wilson, who was a claimed financial expert with multiple degrees and a pedigreed employment history, Gomez expanded from stock trading to also attempting to trade in cryptocurrency.

51.    Gomez and other Wilson discussion group members were encouraged to join the platform called Digicoins and utilize the $200 to $800 provided by the exchange to start "trading." The leader of Gomez's other investment group, Wade Brittingham, encouraged Gomez and other group members to join the platform SolLuna available for download on the Apple App Store.

52.    Gomez has used Apple products for decades, since at least 2007. She trusted apps from the App Store because of her experience with Apple products, her experience with downloading and using other apps from the App Store, and the overall impression Apple has cultivated among its customers—that apps on the App Store are vetted, safe, and trustworthy. This confidence arose from Apple's long-standing commitment to marketing the App Store as a secure platform, where all apps meet rigorous safety standards. She was also assured by Apple's representations on its App Store that its apps could be trusted and were secure and safe as alleged above. In reliance on this impression Apple has cultivated over time that apps on the App Store are vetted, safe, and trustworthy, including Apple's representations regarding the safety and security of App Store apps and based on her belief that the Digicoins and SolLuna apps downloaded from Defendant's App Store were safe and secure, Gomez downloaded Digicoins and SolLuna from the App Store and began transferring money and buying cryptocurrency she believed she could use to conduct legitimate digital trades on the apps. Gomez's reliance on Apple's representations was reasonable because the representations she relied on concern the safety and security of apps from the App Store—the "guiding principle" of the App Store according to Apple—and Gomez relied

upon Apple's representations for these purposes. Gomez used the App Store to download the Digicoins and SolLuna apps in or around the month of October 2023. Gomez downloaded the Digicoins and SolLuna apps onto her iPhone 11, model number NWKM2LL/A, that she purchased from Sprint on or about June, 22, 2021. Gomez would not have purchased her iPhone if she had known the truth about Apple's representations that its apps were not safe or trustworthy

53.    At the end of November 2023, Gomez attempted to withdraw some of her funds from SolLuna and was told she could not withdraw funds until she paid $10,000 in taxes she owed on the increased value of her money. Questioning the legitimacy of the request and the application as a whole, Gomez contacted Apple via Apple chat on November 30, 2023 and subsequently also spoke with an Apple representative. Apple assured Gomez that apps from the App Store were all tested and vetted for legitimacy and authenticity, and that she could safely continue to use the SolLuna app.

54.    Gomez paid the $10,000 into her SolLuna app and continued to attempt to withdraw her funds. However, in mid-December when Gomez tried to withdraw funds from her SolLuna account, her request was refused unless she agreed to pay yet more money into the app for sums she purportedly owned the U.S. government. Convinced SolLuna was a scam, Gomez contacted Apple. Apple removed the SolLuna app a few days later. However, contrary to Apple's representations and stated processes for correction, Gomez and other users of SolLuna were never notified by Apple that SolLuna was a dangerous app used for fraud and malicious activity.

55.    At the same time, Gomez began to suspect Digicoins might also be a scam. She tried to withdraw her funds from Digicoins in mid-December 2023 and was unable to do so. Gomez informed Apple that Digicoins was also a scam. However, Apple continued to make Digicoins available on the App Store for users to download and use under the false impression that Digicoins had been vetted, was safe, and could be trusted. It was not until February 2024 that Apple removed Digicoins from the App Store, and contrary to Apple's representations and stated processes for correction, Gomez and other users of Digicoins were never notified by Apple that Digicoins was a dangerous app used for fraud and malicious activity. In total, Gomez "invested" approximately $72,000 between the Digicoins and SolLuna apps. As a direct result of Apple's process for

reviewing the Digicoins app on its App Store and Gomez's reasonable reliance on Apple's representations assuring her the apps had been vetted, was safe and could be trusted, Plaintiff Gomez was injured and lost approximately $72,000. Because of the false and deceptive material misrepresentations at issue, Plaintiff Gomez also overpaid for her iPhone.

***Plaintiff Kim Sallen's Experience***

56.     In the fall of 2023, Plaintiff Sallen joined an online investment discussion group whose purported objective was to share stock recommendations, investment strategies and to leverage the combined investment resources of the group. Sallen had been educating herself by various means regarding stock investments and trading of digital assets and the online discussion group was part of this process. At the behest of the group leader, an individual using the name Kevin Wilson, who was a claimed financial expert with multiple degrees and a pedigreed employment history, Sallen was encouraged to join the platform called Digicoins, available for download on the Apple App Store, and utilize the $200 to $800 provided by the exchange to start "trading." Sallen downloaded the Digicoins app from the App Store in or around September 2023. In September or October 2023, Sallen was directly contacted by an individual she believed was a member of the Kevin Wilson investment discussion group. This man was purportedly an expert in real estate contracts and contracts trading, including cryptocurrency. He offered to work with Sallen regarding trading of cryptocurrency contracts and commodities contracts. He used Forex5 as a trading platform for such trades and suggested Sallen download the Forex5 app; available on the Apple App Store. Sallen downloaded Forex5 from the App Store in or around October 2023.

57.     Sallen has used Apple products for approximately 20 years. She trusted apps from the App Store because of her experience with Apple products, her experience with downloading and using other apps from the App Store, and the overall impression Apple has cultivated among its customers—that apps on the App Store are vetted, safe, and trustworthy. This confidence arose from Apple's long-standing commitment to marketing the App Store as a secure platform, where all apps meet rigorous safety standards. She was also assured by Apple's representations on its App Store that its apps could be trusted and were secure and safe as alleged above. In reliance on this impression Apple has cultivated over time that apps on the App Store are vetted, safe, and

trustworthy, including Apple's representations regarding the safety and security of App Store apps and based on her belief that the Digicoins and Forex5 apps downloaded from Defendant's App Store were safe and secure, Sallen downloaded Digicoins and Forex5 from the App Store and began transferring money into what she believed were her accounts and buying and trading in cryptocurrency and other assets. Sallen's reliance on Apple's representations was reasonable because the representations she relied on concern the safety and security of apps from the App Store—the "guiding principle" of the App Store according to Apple—and Sallen relied upon Apple's representations for these purposes. Sallen downloaded the Digicoins and Forex5 apps onto her iPhone 12, model number MGF73LL-A, that she purchased when she opened an account with Verizon. Sallen would not have purchased an iPhone if she had known the truth about Apple's representations that its apps were not safe or trustworthy.

58.    In mid-December 2023, Sallen was contacted and informed she was required to pay over $79,000 into her Forex5 app. Sallen questioned Forex5 regarding the payment demand and the responses from Forex5 began to change as regards the reasons she was required to pay the above amount. Soon the app and its customer service stopped responding to Sallen's inquiries and she was locked out of the Forex5 app. Sallen could not withdraw her funds and she lost approximately $60,000 to the Forex5 scam. She reported the Forex5 app to Apple via "app review." After several additional contacts and conversations between Sallen and Apple from late December 2023 to March 2024, Apple finally removed Forex5 from its App Store in or around March 2024. Apple never notified users of the Forex5 app that the app was dangerous and used for fraud.

59.    In early January 2024, Sallen began to suspect that Digicoins was also a scam and attempted to pull her money out of what she thought was her Digicoins account. Sallen was at first told others were able to close out and therefore any difficulty must be at her end. In response to additional attempts and inquires, Sallen was told she would be able to withdraw her funds following routine maintenance of the application. Shortly thereafter, the app and customer support stopped responding and Sallen was shut out of the Digicoins app. Sallen lost approximately $60,000 to the Digicoins scam. And contrary to Apple's representations and stated processes for correction, Sallen

00220155

and other users of Digicoins were never notified by Apple that Digicoins was a dangerous app used for fraud and malicious activity.

60.    As a direct result of Apple's process for reviewing the Digicoins and Forex5 apps on its App Store and Sallen's reasonable reliance on Apple's representations assuring her the apps had been vetted, were safe and could be trusted, Plaintiff Sallen was injured and lost approximately $120,000. Because of the false and deceptive material misrepresentations at issue, Plaintiff Sallen also overpaid for her iPhone.

## CLASS ACTION ALLEGATIONS

61.    Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Federal Rules of Civil Procedure Rules 23(a), (b)(2), and (b)(3), on behalf of the class defined as:

### The Class

All persons who downloaded or otherwise used Digicoins, SolLuna or Forex5 from the Apple App Store within the relevant statutory period to the date notice is sent to the Class.

62.    Excluded from the Class are Defendant and its subsidiaries and related entities; all persons who make a timely election to be excluded from the Class; governmental entities; and any judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

63.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

64.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23 for the following reasons:

### Numerosity

65.    Pursuant to Federal Rule of Civil Procedure 23(a)(1), the members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are hundreds of members of the

18

00220155

Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Defendant's records. Class members may effectively and efficiently be notified of the pendency of this action by recognized, Court-approved dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or publication.

**Commonality and Predominance**

66.    Pursuant to Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3), this action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether Defendant engaged in the conduct alleged herein;

b.    Whether Defendant's conduct constituted violations of state consumer protection laws;

c.    Whether Plaintiffs and the other Class members are entitled to damages, restitution or other monetary relief and, if so, in what amount; and

d.    Whether injunctive relief is appropriate, including corrective advertising regarding the safety of App Store apps, and the form thereof.

**Typicality**

67.    Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were injured through Defendant's wrongful conduct as described above.

**Adequacy**

68.    Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained experienced counsel competent in complex multi-party and class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

**Superiority**

69.    Class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in

the management of this action as a class action. The damages suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Apple, so it would be impracticable for members of the proposed Class to individually seek redress from the courts. Even if the individual Class members could afford to undertake individual litigation, such individual claims would unnecessarily burden the court system should they do so. Furthermore, individual litigation creates potential for inconsistent or contradictory orders and judgments and increases delay and expense to the parties and to the court system. A class action would present fewer administrative difficulties, would be more efficient, and would enhance the interests of consistent and fair justice in this matter.

70.     In the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

71.     Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide relief to Plaintiffs and Class members.

72.     Unless the Class is certified, Defendant will retain monies that were taken from Plaintiffs and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

### COUNT I

### Violations of the Unfair Competition Law,
### Cal. Bus. & Prof. Code § 17200, *et seq.*

73.     Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint, as if set forth fully herein.

74.     Plaintiffs and Defendant are "persons" within the meaning of the UCL. Cal. Bus. & Prof Code § 17201.

00220155

75.     The UCL defines unfair competition to include any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof Code § 17200.

76.     As a result of engaging in the conduct alleged in this Complaint, Defendant has violated the UCL's proscription against engaging in "unlawful" conduct by virtue of its violations of California's Consumers Legal Remedies Act, Civil Code § 1750, violation of Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and the common law. Plaintiffs reserve the right to allege other violations of law which constitute unlawful business acts or practices under the UCL.

77.     As a result of engaging in the conduct alleged in this Complaint, Defendant has also violated the UCL prohibition against unfair business acts or practices. Defendant's unfair conduct alleged in this Complaint is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers because consumers have lost substantial amounts of money using App Store apps that were not legitimate, vetted or safe as represented by Apple. There is no utility or legitimate business purpose for Apple's conduct in that Apple by its express representations and long-term campaign promises that apps from its App Store are legitimate, safe and secure and can be downloaded with confidence because of Apple's vetting process and security standards. However, because Apple has prioritized profit over ethics, Apple fails to adequately vet predatory, potentially devastating "pig butchering" cryptocurrency scam apps and makes them available to download despite its continuing misrepresentations that the apps in its App Store are vetted, safe and trustworthy.

78.     Apple's unfair conduct also undermines public policies aimed at protecting consumers from harm, especially in digital marketplaces. California, in particular, has a strong public policy in favor of safeguarding consumers against deceptive practices and ensuring that products and services available to the public do not pose undue risk of fraud or financial loss. Public policy encourages protecting citizens from financial scams and fraudulent schemes, particularly in digital markets where consumers are more vulnerable. By allowing fraudulent apps that facilitate "pig butchering" scams, Apple's conduct violates public policy aimed at preventing fraud and financial exploitation. Public policies also generally uphold the importance of transparency and truthfulness in advertising, especially when companies make safety and security claims. Apple's representations of App Store safety create a misleading sense of security, and violate policies against

00220155

false advertising. There is also a public policy interest in maintaining high standards of digital security and privacy for consumers. Particularly given its representations to the contrary, Apple's failure to vet the Digicoins, SolLuna, and Forex5 apps contravenes public policies intended to ensure that digital services, especially those related to finance, do not expose users to unnecessary risk. Public policy supports the principle that companies with substantial market control have a duty to protect users from known risks, especially where users cannot avoid these risks themselves. Apple's exclusive control over iOS app distribution heightens its duty to protect consumers, and its failure to do so conflicts with public policies focused on consumer protection in monopolized digital markets.

79.    Defendant's business practices are also unfair within the meaning of the UCL because the injury to Plaintiffs and the Class is not outweighed by any countervailing benefits to consumers or competition, and the injury could not reasonably be avoided by Plaintiffs and the Class members. There were reasonable available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

80.    As a result of engaging in the conduct alleged in this Complaint, Defendant has also violated the UCL prohibition against fraudulent business acts or practices by representing that apps from its App Store are legitimate, safe and secure and can be downloaded with confidence because of Apple's vetting process and security standards. Defendant's conduct as set forth fully above was false, misleading and/or likely to deceive a reasonable consumer. A reasonable consumer would be deceived or mislead by Apple's representations because the representations regarding the legitimacy, safety and security of App Store apps are material to consumers' decision to purchase Apple hardware devices (iPhones and iPads) and download and use App Store apps for financial transactions and related purposes. Plaintiffs and other Class members have in fact been deceived as a result of their reliance on Defendant's material misrepresentations.

81.    Plaintiffs have suffered injury in fact and lost money or property as a result of Defendant's unlawful, unfair and fraudulent business acts and practices alleged herein. Because of the unfair business practices at issue, Plaintiffs and members of the Class have suffered an injury in fact and have lost money and property, including, but not limited to, the expected utility and

00220155

performance of their Apple iPhones and iPads, the purchase price of their Apple devices, and/or the difference between the price Class members paid and the actual worth of the hardware product had Apple disclosed the true nature of the representations at issue. As a result of Defendant's misconduct and representations, Plaintiffs also invested and lost thousands of dollars in scam apps they acquired through Apple's App Store.

82.     Apple's conduct in violation of the UCL is ongoing and continuing to this date. The unlawful, unfair and fraudulent business acts and practices of Defendant described herein present a continuing threat in that Apple is currently engaging in such acts and practices, and will persist and continue to do so unless and until an injunction is issued by this Court. Plaintiffs intend to continue to purchase App Store apps in the future if they are secure and comport with Apple's claims regarding its standards, vetting and review. Because Plaintiffs own Apple iPhones and/or iPads, and the ability to download and use apps is integral to the core functionality of the Apple devices they own, they have no reasonable, comparable alternatives except to download and use apps from Apple's App Store. Injunctive relief, in the form of corrective advertising, is necessary to dispel public misperception about the safety and trustworthiness of apps in Apple's App Store that has results from years of Apple's unlawful marketing efforts and to prevent current and future Apple product users from being misled.

83.     Plaintiffs, on behalf of themselves Class members seek restitution from Defendant of all money and property lost by Plaintiffs and the other members of the Class investing through the Digicoins, SolLuna, and Forex5 apps acquired through the App Store and by overpaying for their Apple hardware devices, an injunction prohibiting Defendant from continuing the unfair business practices, corrective advertising, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

### COUNT II

**Violations of Consumers Legal Remedies Act,**
**Cal. Civ. Code § 1750, *et seq.***

84.     Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

00220155

85.    At all relevant times the Apple devices (e.g., iPhones or iPads), which include the App Store and applications available therein are goods or services that Apple has marketed and that Plaintiffs and Class members purchased or obtained for personal, family, or household purpose and, as such, are "goods" and "services" as defined by Cal. Civil Code sections 1761(a), (b).

86.    Plaintiffs and Class members are individuals who purchased or leased and have used one or more Apple devices (e.g., iPhones or iPads) for personal, family or household purposes and, as such, are "consumers" defined in Cal. Civil Code section 1761(d). Apple is a corporation and, as such, is a "person" as that term is defined in Cal. Civ. Code section 1761(c).

87.    Plaintiffs and Class members purchased iPhones and iPads based at least in part on the mistaken belief and impression cultivated by Apple that the devices could be used to download safe and trustworthy apps vetted by Apple and available in the App Store, and that Apple does not permit apps that violate its developer guidelines (including requirements for safe and trustworthy cryptocurrency exchange apps). Plaintiff and members of the Class would not have purchased the Apple hardware devices and/or would not have paid as much for them if Apple disclosed that the representations discussed herein were false and misleading.

88.    In offering apps for download in the App Store onto Apple devices (e.g., iPhones or iPads), Apple represented that applications downloaded from the App Store are safe for use on the Apple devices. Apple represents inter alia that "the App Store has proved to be a safe and trusted place to discover and download apps," that Apple is "[d]edicated to trust and safety," that "Apps must adhere to our guidelines," that "[e]very week, over 500 dedicated experts around the world review over 100 Apps," and that "[o]ver 1M submissions rejected for objectionable, harmful, unsafe, or illegal content."[23]

89.    As a result of these and other representations as alleged above, Plaintiffs and Class members purchased iPhones and iPads and downloaded and used the Digicoins, SolLuna, and Forex5 apps from the App Store. A reasonable consumer would be deceived or mislead by Apple's representations because the representations regarding the legitimacy, safety and security of App

---

[23]    https://www.apple.com/app-store/ (last visited Nov. 13, 2024).

00220155

Store apps are material to consumers' decision to purchase iPhones and iPads and download and use App Store apps for financial transactions and purposes.

90.    Notwithstanding these representations, the Digicoins, SolLuna, and Forex5 applications were not legitimate, safe and trustworthy and Defendant failed to properly vet the Digicoins, SolLuna, and Forex5 applications before providing them to the public.

91.    By virtue of this ongoing practice and course of conduct, Defendant has violated and will continue to violate section 1770(a)(2) of the CLRA by misrepresenting the source, sponsorship, approval, or certification of its goods or services.

92.    By virtue of this ongoing practice and course of conduct, Defendant has violated and will continue to violate section 1770(a)(5) of the CLRA by representing that its goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

93.    By virtue of this ongoing practice and course of conduct, Defendant has violated and will continue to violate section 1770(a)(7) of the CLRA by representing that its goods or services are of a particular standard, quality, or grade, when in fact, they are of another.

94.    By virtue of this ongoing practice and course of conduct, Defendant has violated and will continue to violate section 1770(a)(9) of the CLRA by advertising goods … with intent not to sell them as advertised.

95.    Defendant's violations of the CLRA present a continuing threat to Plaintiffs and Class members in that Defendant continues to engage in the above-referenced acts and practices, and unless enjoined from doing so by this Court, will continue to do so. Plaintiffs intend to continue to download and use App Store apps in the future if they are secure and comport with Apple's claims regarding standards, vetting and review. Because Plaintiffs own Apple iPhones and/or iPads, and the ability to download and use apps is integral to the core functionality of the Apple devices they own, they have no reasonable, comparable alternatives except to download and use apps from Apple's App Store. Injunctive relief, in the form of corrective advertising, is necessary to dispel public misperception about the safety and trustworthiness of apps in Apple's App Store that has

00220155

1    results from years of Apple's unlawful marketing efforts and to prevent current and future Apple

2    product users from being misled. Defendant's conduct is fraudulent, wanton and malicious.

3        96.      In compliance with Civil Code section 1782, more than 30 days before bringing these

4    claims, Plaintiffs provided notice to Defendant of its violations and provided it with an opportunity

5    to cure its violations. *See* **Exhibit A** attached. Defendant did not avail itself of this opportunity. In

6    compliance with Civil Code section 1780(d), attached as **Exhibit B** is the affidavit showing that the

7    action has been commenced in the proper forum.

8        97.      Plaintiffs seek an order awarding actual damages, equitable relief, as well as an award

9    of attorneys' fees and costs pursuant to Civil Code § 1780 (a), (d) and (e).

10                            **PRAYER FOR RELIEF**

11       WHEREFORE, Plaintiffs respectfully pray for judgment against Defendant as follows:

12   A.      For an Order certifying the Class;

13   B.      For an Order declaring Defendant's conduct unlawful;

14   C.      For preliminary and permanent injunctive relief prohibiting Defendant from

15           committing in the future those violations of law herein alleged and for corrective

16           advertising to inform users regarding Defendant's failure to comply with its vetting

17           and review of App Store apps;

18   D.      For damages and restitution to Plaintiffs and to the Class as permitted by law and

19           equity under the laws alleged herein;

20   E.      For pre- and post- judgment interest according to proof;

21   F.      For costs of suit, including reasonable attorney fees, costs, and expenses under

22           applicable provisions of law;

23   G.      For all other relief this Court deems just, equitable, and proper.

24   ///

25   ///

26   ///

27   ///

28   ///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiffs hereby request a jury trial for all issues triable by jury.

Respectfully submitted,

Dated: December 20, 2024

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
ADAM M. BUCCI (327312)

By:        *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
toreardon@bholaw.com
abucci@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW (*pro hac vice forthcoming*)
ANTHONY L. PARKHILL (*phv forthcoming*)
205 W. Randolph Street, #1630
Chicago, IL  60606
Tel: 312/621/2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiffs*

27

00220155