1   BLOOD HURST & O'REARDON, LLP
    TIMOTHY G. BLOOD (149343)
2   LESLIE E. HURST (178432)
    THOMAS J. O'REARDON II (247952)
3   ADAM M. BUCCI (327312)
    501 West Broadway, Suite 1490
4   San Diego, CA 92101
    Tel: 619/338-1100
5   619/338-1101 (fax)
    tblood@bholaw.com
6   lhurst@bholaw.com
    toreardon@bholaw.com
7   abucci@bholaw.com

8   BARNOW AND ASSOCIATES, P.C.
    BEN BARNOW (*pro hac vice*)
9   ANTHONY L. PARKHILL (*pro hac vice*)
    205 W. Randolph Street, #1630
10  Chicago, IL 60606
    Tel: 312/621/2000
11  312/641-5504 (fax)
    b.barnow@barnowlaw.com
12  aparkhill@barnowlaw.com

13  Attorneys for Plaintiffs

14              **UNITED STATES DISTRICT COURT**

15      **NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

16  SANDEEP KAPIL, GABRIELA GOMEZ, and      Case No. 5:24-cv-09304-NW
    KIM SALLEN, on behalf of themselves and all
17  others similarly situated,                **PLAINTIFFS' OPPOSITION TO**
                                              **DEFENDANT'S MOTION TO DISMISS**
18              Plaintiffs,

19      v.                                    **CLASS ACTION**

20  APPLE, INC.,                             **Date:**      **May 28, 2025**
                                             **Time:**      **9:00 a.m.**
21              Defendant.

22                                           District Judge Noël Wise
                                             Courtroom 8, 4th Floor, San Jose Courthouse
23
                                             Complaint Filed:    December 20, 2024
24                                           Trial Date:         Not Set

25                                           **JURY TRIAL DEMANDED**

26

27

28

BLOOD HURST & O' REARDON, LLP

00224670

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..............................................................................................1

II. BACKGROUND ..............................................................................................1

    A.  Apple Represents Apps on the App Store Are Safe and Legitimate .........................1

    B.  Plaintiffs Are Victims of Scam Apps Apple Made Available on the App Store ..........3

III. ARGUMENT ..................................................................................................6

    A.  Plaintiffs Have Standing to Challenge Apple's Alleged Misrepresentations ............6

        1.  Apple's Representations Caused Plaintiffs' Harm .........................6

        2.  Plaintiffs Properly Plead Reliance ................................................10

        3.  Plaintiffs Have Standing Under the CLRA ....................................14

    B.  Plaintiffs Sufficiently Plead Their Claims ........................................14

        1.  Plaintiffs' Allegations Satisfy Rule 9(b) ......................................15

            a.  Plaintiffs Plead Their Claims with Particularity ...............15

            b.  Plaintiffs Adequately Plead the False or Misleading Nature of Apple's Representations ..................................18

        2.  Plaintiffs Sufficiently Allege Predicate Violations to State an Unlawful UCL Claim ..................................................20

    C.  Plaintiffs Properly Seek Restitution and Injunctive Relief ....................................21

        1.  Restitution ....................................................................................21

        2.  Injunctive Relief ..........................................................................24

IV. CONCLUSION ..............................................................................................25

BLOOD HURST & O' REARDON, LLP

00224670

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actimmune Mktg. Litig.*,
   No. C 08-02376 MHP, 2009 U.S. Dist. LEXIS 103408
   (N.D. Cal. Nov. 6, 2009) ........................................................................................ 21

*Am. Philatelic Soc. v. Claibourne*,
   3 Cal. 2d 689 (1935) ............................................................................................... 8

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ................................................................................. 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 14

*Brown v. Google LLC*,
   685 F. Supp. 3d. 909 (N.D. Cal. 2023) ................................................................. 21

*Cabebe v. Nissan N. Am., Inc.*,
   No. 18-cv-00144-WHO, 2018 U.S. Dist. LEXIS 185017
   (N.D. Cal. Oct. 26, 2018) ................................................................................. 23, 24

*Cal. Med. Ass'n v. Aetna Health of Cal. Inc.*,
   14 Cal. 5th 1075 (2023) .............................................................................. 7, 10, 11, 12

*Clayworth v. Pfizer, Inc.*,
   49 Cal. 4th 758 (2010) ............................................................................................. 6

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
   35 Cal. 3d 197 (1983) (superseded on other grounds) ......................................... 13

*Conrad v. Boiron, Inc.*,
   869 F.3d 536 (7th Cir. 2017) ................................................................................. 25

*Doe 1 v. AOL, LLC*,
   719 F. Supp. 2d 1102 (N.D. Cal. 2010) .................................................................. 8

*Doe v. Successfulmatch.com*,
   70 F. Supp. 3d 1066 (N.D. Cal. 2014) .................................................................. 19

*In re Firearm Cases*,
   126 Cal. App. 4th 959 (2005) .................................................................................. 9

*Freeman v. Indochino Apparel, Inc.*,
   443 F. Supp. 3d 1107 (N.D. Cal. 2020) ........................................................... 21, 22

00224670

BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Google, Inc. Privacy Policy Litig.*,
    58 F. Supp. 3d 968 (N.D. Cal. 2014) ................................................................. 21

*Graham v. Bank of Am. N.A.*,
    226 Cal. App. 4th 594 (2014) ............................................................................... 9

*Granato v. Apple Inc.*,
    No. 5:22-cv-02316-EJD, 2023 U.S. Dist. LEXIS 124318
    (N.D. Cal. July 19, 2023) ..................................................................................... 22

*Greenstein v. Noblr Reciprocal Exch.*,
    585 F. Supp. 3d 1220 (N.D. Cal. 2022) ............................................................. 25

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022) ............................................................................. 22

*Haas v. Travelex Ins. Servs.*,
    555 F. Supp. 3d 970 (C.D. Cal. 2021) ............................................................... 22

*Hadley v. Kellogg Sales Co.*,
    273 F. Supp. 3d 1052 (N.D. Cal. 2017) ............................................................. 15

*Hayden v. Retail Equation, Inc.*,
    No. SA CV 20-01203-DOC-DFM, 2022 U.S. Dist. LEXIS 142010
    (C.D. Cal. July 22, 2022) ..................................................................................... 21

*In re iPhone Application Litig.*,
    6 F. Supp. 3d 1004 (N.D. Cal. 2013) ................................................................. 10

*J.J. v. Ashlynn Mktg. Grp., Inc.*,
    749 F. Supp. 3d 1086 (S.D. Cal. 2024) ............................................................. 22

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ............................................................................. 15

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ....................................................................................... 23

*Kwikset Corp. v. Super. Ct.*,
    51 Cal. 4th 310 (2011) ................................................................................... 7, 23

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014) ............................................................................. 14

*Libman v. Apple, Inc.*,
    No. 22-cv-07069-EJD, 2024 U.S. Dist. LEXIS 175118
    (N.D. Cal. Sept. 26, 2024) ................................................................................... 22

*Loomis v. Slendertone Distrib., Inc.*,
    420 F. Supp. 3d 1046 (S.D. Cal. 2019) ............................................................. 17

00224670

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ............................................................................. 25

*Lorenzo v. Qualcomm Inc.*,
No. 08cv2124 WQH (LSP), 2009 U.S. Dist. LEXIS 69843
(S.D. Cal. Aug. 10, 2009) ...................................................................................... 9

*May v. Google LLC*,
No. 24-cv-01314-BLF, 2024 U.S. Dist. LEXIS 200398
(N.D. Cal. Nov. 4, 2024) ........................................................................................ 9

*Modisette v. Apple Inc.*,
30 Cal. App. 5th 136 (2018) ............................................................................... 10

*Moore v. Mars Petcare US, Inc.*,
966 F.3d 1007 (9th Cir. 2020) ........................................................................... 14

*Morgan v. AT&T Wireless Servs., Inc.*,
177 Cal. App. 4th 1235 (2009) .......................................................................... 13

*Morrison v. Trivita, Inc.*,
No. 12-CV-1387 BEN (BLM), 2013 U.S. Dist. LEXIS 38357
(S.D. Cal. Mar. 18, 2013) ................................................................................... 17

*Moyle v. Liberty Mut. Ret. Benefit Plan*,
823 F.3d 948 (9th Cir. 2016) ............................................................................. 22

*In re Natera Prenatal Testing Litig.*,
664 F. Supp. 3d 995 (N.D. Cal. 2023) .............................................................. 22

*Newtok Vill. v. Patrick*,
21 F.4th 608 (9th Cir. 2021) .............................................................................. 14

*In re NJOY Consumer Class Action Litig.*,
No. CV 14-00428 MMM(JEMx), 2014 U.S. Dist. LEXIS 196586
(C.D. Cal. May 27, 2014) ............................................................................. 19, 20

*O'Handley v. Weber*,
62 F.4th 1145 (9th Cir. 2023) ........................................................................... 7, 8

*Opperman v. Path, Inc.*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) .......................................................... 12, 13

*In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig.*,
No. ML 12-2317 CAS (JEMx), 2012 U.S. Dist. LEXIS 172869
(C.D. Cal. Dec. 3, 2012) .................................................................... 14, 15, 16, 17

*Pirozzi v. Apple, Inc.*,
966 F. Supp. 2d 909 (N.D. Cal. 2013) ................................................... 16, 18, 21

BLOOD HURST & O' REARDON, LLP

00224670

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) ............................................................................... 19

*Sagastume v. Psychemedics Corp.*,
    No. CV 20-6624 DSF (GJSx), 2020 U.S. Dist. LEXIS 247754
    (C.D. Cal. Nov. 30, 2020) ................................................................................... 22

*Shaeffer v. Califia Farms, LLC*,
    44 Cal. App. 5th 1125 (2020) .............................................................................. 10

*Shersher v. Superior Court*,
    154 Cal. App. 4th 1491 (2007) ............................................................................ 23

*Shin v. Campbell Soup Co.*,
    No. CV 17-1082-DMG (JCx)2018 U.S. Dist. LEXIS 228058
    (C.D. Cal. June 11, 2018) .................................................................................... 21

*Sihler v. Fulfillment Lab, Inc.*,
    No. 3:20-cv-01528-H-MSB, 2020 U.S. Dist. LEXIS 230404
    (S.D. Cal. Dec. 8, 2020) ...................................................................................... 17

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .......................................................................... 21, 22

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................................................... 6

*Steiner v. Vi-Jon Inc.*,
    723 F. Supp. 3d 784 (N.D. Cal. 2024) ................................................................ 22

*Summit Est., Inc. v. United Healthcare Ins. Co.*,
    No. 4:19-cv- 06724 YGR, 2020 U.S. Dist. LEXIS 166721
    (N.D. Cal. Sept. 10, 2020) ................................................................................... 22

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) .................................................................................... 7, 13

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ............................................................................... 19

**Statutes**

Bus. & Prof. Code § 17200, *et seq.* ................................................................... *passim*

Bus. & Prof. Code
    § 17204 .............................................................................................................. 6, 7
    § 17205 .......................................................................................................... 21, 22

Civ. Code § 1750, *et seq.* .................................................................................... *passim*

BLOOD HURST & O' REARDON, LLP

v

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Civ. Code
   § 1752 ................................................................................................................ 21
   § 1770(a) ........................................................................................................... 14
   § 1780 ................................................................................................................. 6
   § 1780(a) ........................................................................................................... 21

**Rules**

Fed. R. Civ. P.
   9(b) ............................................................................................ 14, 15, 16, 17, 19
   12(b)(6) ............................................................................................................. 14

BLOOD HURST & O' REARDON, LLP

00224670

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

## I.    INTRODUCTION

Despite representing its App Store as a safe and trusted platform, Defendant Apple, Inc. ("Apple") approved and promoted as safe fraudulent cryptocurrency apps that cost Plaintiffs and Class members millions of dollars in a "pig butchering" scam. Plaintiffs believed the cryptocurrency apps they downloaded from the App Store could be trusted because Apple promises all apps go through a rigorous vetting process that ensures they are safe, and further represents cryptocurrency apps must meet additional standards that ensure their legitimacy. Despite decades of marketing centered on the safety of Apple's ecosystem and apps in the App Store, Apple does not adequately vet apps to safeguard against well-known and prevalent pig butchering scams. Plaintiffs bring claims against Apple under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL") and Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA") based on Apple's misleading and fraudulent representations about the safety and vetting of apps on the App Store. As shown herein, Plaintiffs adequately plead their claims and Apple's Motion to Dismiss ("MTD") should be denied in its entirety.

## II.    BACKGROUND

### A.    Apple Represents Apps on the App Store Are Safe and Legitimate

For nearly two decades, Apple has engaged in widespread advertising and marketing efforts touting the safety and security of the Apple ecosystem and App Store applications in a concerted effort "to build and promote a reputation of providing apps that are safe and can be trusted." Class Action Complaint, ECF No. 1, ¶¶ 18, 33.[1] In 2007, Apple co-founder and CEO Steve Jobs stated that the purpose of Apple's efforts ultimately leading to the App Store was to allow developers access to the iPhone's software platform "while at the same time protecting users from malicious programs." ¶ 23. Apple represents that "[f]or over a decade, the App Store has proved to be a safe and trusted place to discover and download apps. . . . And a big part of those experiences is ensuring that the apps we offer are held to the highest standards for privacy, security, and content." ¶ 17.

---

[1]    All ¶ references are to the Class Action Complaint

BLOOD HURST & O' REARDON, LLP

00224670

Apple represents that the "guiding principle of the App Store" is providing a safe experience, claiming "[c]ustomer trust is a cornerstone of the App ecosystem. Apps should never prey on users or attempt to rip off customers." ¶ 28. Apple promotes its App Store vetting process as a stringent security measure, explaining that proposed apps are, among other things, review by experts for privacy, security, and safety concerns. ¶¶ 21, 24. Apple advertises its App Review Guidelines on the App Store, claiming the Guidelines "ensure that the apps on the App Store adhere to [Apple's] strict app review standards," which require, among other things, apps "to be safe," "secure devices from malware and threats," and "use approved business models." ¶ 25. Apple promises every app available on the App Store has met its security and safety standards. ¶ 28.

In addition, Apple claims to maintain specific security standards for cryptocurrency exchange apps. ¶¶ 21, 30–32. Apple represents that cryptocurrency apps, among other things, come from approved financial institutions and comply with all legal requirements. ¶¶ 21, 30. Apple advertises that its "efforts have made Apple's platforms the safest for consumers around the world." ¶ 29.

Apple promotes itself as "a company committed to user privacy and security" to distinguish itself from its competitors and gain a competitive advantage in the sale of its electronic devices. *See, e.g.*, ¶¶ 3–4, 19. Apple's business model depends on both the sale of electronic devices such as iPhones and on providing a range of apps through the App Store. ¶ 2. Apple's long-term marketing of the safety and security of apps on the App Store and Apple devices increases consumer trust in Apple apps and devices because consumers reasonably believe Apple products are safer and more secure than competitors' devices. ¶¶ 3–4, 18.

Apple maintains exclusive control over the apps available to purchasers and users of Apple devices by not allowing alternative app sources or sideloading, so the only practical or convenient way to download apps is through the App Store. ¶¶ 2, 20, 36. Because consumers have no alternative way to download apps, consumers would be less likely to purchase Apple hardware if App Store apps are perceived as unsafe. ¶¶ 3, 35–37. Representing the App Store and apps available in it as safe and secure makes Apple's ecosystem more appealing, thereby driving hardware sales. ¶ 4.

Combined, Apple's exclusive control over what apps are available in the App Store and its representations that those apps go through a rigorous vetting process and are safe reasonably leads consumers to believe that an app available on the App Store is inherently legitimate and trustworthy. ¶¶ 18–19, 21–22, 36. The prevalence of Apple's message that the App Store is highly curated and apps are heavily vetted before being made available creates a reasonable belief that apps must be free from malicious or fraudulent intent and are safe and legitimate by default because Apple would not publish a fraudulent or unsafe app in the App Store otherwise. ¶¶ 18, 21, 36. This is especially true for apps related to highly regulated fields such as finance and investing. ¶ 21.

**B.    Plaintiffs Are Victims of Scam Apps Apple Made Available on the App Store**

Pig butchering scams involve luring a victim to make increasingly large monetary payments to a seemingly sound investment. ¶ 5 n.1. One way in which fraudsters carry out this type of fraud is to create fake cryptocurrency trading platforms in which they convince targets to deposit money into their "account" to invest in proprietary cryptocurrencies. ¶¶ 41–42. The fraudsters convince victims their "investments" are achieving high returns, when in reality no cryptocurrency trading occurs, and the fraudsters steal all the money victims deposit into their accounts. ¶ 42. Fraudsters intentionally seek to get their pig butchering apps published on the App Store, as the mere presence of the app in the App Store legitimizes them and makes the ruse all the more convincing. ¶¶ 34, 39. Apple knows these cryptocurrency scams exist and knows fraudulent pig butchering apps are present on the App Store due to the prevalence of these scams and previous instances of this type of scam apps appearing in the App Store. ¶ 34. *See also* ¶¶ 43–44 (describing earlier warnings of pig butchering apps appearing in the App Store).

Plaintiffs are owners of Apple devices who became victims of fraudulent scam applications Apple published on the App Store. ¶¶ 5, 47, 52, 57.

Plaintiff Kapil has used Apple products for over two decades. ¶ 47. He trusted that apps on the App Store were trustworthy and safe to use based on Apple's long-term marketing of the security of the App Store, its representations in the App Store about the rigorous safety vetting apps must go through, and his prior experience using the App Store. *Id.* Kapil joined an online investment discussion group in or about August 2023. ¶ 45. The group's leader encouraged Kapil and other

group members to expand into cryptocurrency trading and to download an app called Digicoins from the App Store or Google Play Store. ¶¶ 45–46. Based on Apple's representations and long-term marketing about the safety of apps on the App Store, Kapil downloaded the Digicoins app from the App Store in or about August 2023 and began transferring small amounts of money to the app in the belief it was a legitimate trading platform. ¶¶ 46–48.

Kapil sought out additional information and reassurances from Apple about the legitimacy of the Digicoins app before investing larger amounts. ¶ 48. He reviewed Apple's App Review Guidelines, specifically including the particular requirements for cryptocurrency apps. *Id.* These representations reaffirmed Kapil's initial belief in the legitimacy of the Digicoins app, and in reliance on Apple's representations he began transferring large amounts of money into the Digicoins app. *Id.* Contrary to Apple's assurances of the legitimacy and requirements for cryptocurrency trading apps, the Digicoins app was actually part of a pig butchering scam. ¶ 49. In February 2024, the Digicoins app ceased to function and Kapil's account was frozen, and the $1,236,935 Kapil had transferred into the app was gone. *Id.*

Plaintiff Gomez has used Apple products since at least 2007. ¶ 52. She trusted that apps on the App Store were trustworthy and safe to use based on Apple's long-term marketing of the security of the App Store, its representations in the App Store about the rigorous safety vetting apps must go through, and her prior experience using the App Store. *Id.* Gomez joined two online investment discussion groups in or about August 2023. ¶ 50. The leader of each group encouraged Gomez and other group members to expand into cryptocurrency trading and to download the Digicoins app and an app called SolLuna from the App Store. ¶¶ 50–51. Based on Apple's representations and long-term marketing about the safety of apps on the App Store, Gomez downloaded the Digicoins and SolLuna apps from the App Store in or about October 2023, and began transferring money to the apps in the belief they were legitimate trading platforms. ¶ 52.

In November 2023, Gomez attempted to withdraw funds from the SolLuna app, but was told she could not without paying another $10,000 for taxes she allegedly owed. ¶ 53. Suspicious about the SolLuna app, Gomez contacted Apple directly on November 30, 2023, and spoke with an Apple representative. *Id.* Apple informed Gomez that apps available on the App Store are vetted for

BLOOD HURST & O' REARDON, LLP

00224670

legitimacy and authenticity, and that it was safe to continue using the SolLuna app. *Id.* Based on Apple's assurances, Gomez transferred the $10,000 payment into her SolLuna account. ¶ 54. Eventually, Gomez discovered that both the Digicoins and SolLuna apps were pig butchering scams, and the $72,000 she had deposited between both apps was gone. ¶¶ 54–55.

Plaintiff Sallen has used Apple products for approximately 20 years. ¶ 57. She trusted that apps on the App Store were trustworthy and safe to use based on Apple's long-term marketing of the security of the App Store, its representations in the App Store about the rigorous safety vetting apps must go through, and her prior experience using the App Store. *Id.* Sallen joined an online investment discussion group in fall of 2023. ¶ 56. The group's leader encouraged Sallen and other group members to expand into cryptocurrency trading and to download an app called Digicoins from the App Store. *Id.* Based on Apple's representations and long-term marketing about the safety of apps on the App Store, Sallen downloaded the Digicoins app from the App Store in or about September 2023 and began transferring money to the app in the belief it was a legitimate trading platform. ¶ 56. In September or October 2023, another individual contacted Sallen and convinced her to download and use the Forex5 app from the App Store to invest in cryptocurrency, which she did in or about October 2023. *Id.* In December 2023, Sallen was contacted and told to pay over $79,000 into the Forex5 app. ¶ 58. Sallen was soon locked out of the app and the approximately $60,000 she had deposited was gone. *Id.* In January 2024, Sallen became suspicious of the Digicoins app and attempted to withdraw her money. ¶ 59. She was soon locked out of that app as well, losing an additional approximately $60,000. *Id.*

Based on Apple's representations, Plaintiffs trusted that apps available on the App Store had been vetted for safety and legitimacy and would not be scams. Relying on these representations, Plaintiffs each lost thousands of dollars or more to fraudulent cryptocurrency apps Apple approved and made available on the App Store, in contrast to its representations about app safety and its vetting process. Had Plaintiffs known Apple's representations regarding the safety of apps on the App Store were not true and known that Apple authorizes and maintains malicious, fraudulent apps on the App Store, they would not have purchased their iPhones or would have paid less for them. ¶¶ 12, 52, 57.

III.    **ARGUMENT**

    A.    **Plaintiffs Have Standing to Challenge Apple's Alleged Misrepresentations**

        1.    **Apple's Representations Caused Plaintiffs' Harm**

The requirements of standing—the opportunity to challenge alleged misconduct in a court of law—are not onerous. Article III causation requires only that plaintiff's injury is "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The purpose of a standing requirement [under the UCL] is to ensure that the courts will decide only actual controversies between the parties with a sufficient interest in the subject matter of the dispute to press their case with vigor." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 788 (2010).[2] The UCL thus includes the "facially simple threshold condition" (*id.* at 789) that plaintiff "has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. The CLRA is available to "[a]ny consumer who suffers any damage as a result of the use or employment" by defendant of prescribed practices. Cal. Civ. Code § 1780; *see also id.* § 1770.

Here, the challenged conduct is Apple's representations that apps downloaded from its App Store are legitimate, safe, and trustworthy; that consumers "could feel good about using every single one of" its apps because of Apple's security and vetting practices in accordance with its "strict app review guidelines." ¶¶ 17, 21, 22, 25. Plaintiffs' injury is "fairly traceable to the challenged conduct of the defendant" (*Spokeo*, 578 U.S. at 338) because in the absence of Apple's representations Plaintiffs would not have lost money using the scam apps or bought their iPhones for the price paid, if at all. ¶¶ 47–48, 52, 57.

Apple does not contest "but for" causation. It instead argues that Apple is not the "legal cause" of Plaintiffs' harm because the scam was effectuated by others, not Apple. MTD at 7. In essence, Apple contends the supervening cause was the scammers so that Apple is not the proximate or legal cause of Plaintiffs' harm.

First, Apple has no authority that a proximate cause requirement from the law of negligence has been imported into standing for Article III, the UCL, or the CLRA. For Article III standing, "the

---

[2]    Here and throughout, internal citations are omitted unless otherwise noted.

BLOOD HURST & O' REARDON, LLP

traceability requirement is less demanding than proximate causation, and thus the 'causation chain does not fail solely because there are several links' or because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023).

The California Supreme Court likewise declined to import "proximate causation" into UCL standing: "There are reasons to doubt that section 17204 imports a proximate cause requirement from the substantive law of negligence into the test for UCL standing. Neither the text of section 17204 nor our decisions in *Kwikset* and *Tobacco II Cases*, which address reliance as the causative mechanism in misrepresentation cases, contain language suggesting a proximate causation test applies." *Cal. Med. Ass'n v. Aetna Health of Cal. Inc.*, 14 Cal. 5th 1075, 1096–97 (2023).[3]

Apple is thus wrong that standing requires that a defendant's conduct be the ultimate or final cause of the harm. "A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff in all reasonable probability would not have engaged in the injury-producing conduct." *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009).

"While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. It is not . . . necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole *or even the predominant or decisive factor in influencing his conduct*. It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Id.* (emphasis added); *see also Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326–27 (2011) (plaintiff need not allege that the misrepresentations "were the sole or even the decisive cause of the injury-producing conduct").

---

[3] Even if the negligence law of proximate causation were to apply, a supervening cause breaks the causation chain only if it is a later cause of independent origin "that was neither 'foreseeable by the defendant' nor 'caused injury of a type which was foreseeable.'" *Cal. Med.*, 14 Cal. 5th at 1097. Here, it was foreseeable that cryptocurrency trading apps might be used for digital trading fraud. ¶¶ 34, 43–44. That is why Apple supposedly reviews cryptocurrency apps for compliance with its standards before allowing the apps onto the App Store.

BLOOD HURST & O' REARDON, LLP

00224670

It is the same for "traceability" under Article III. *O'Handley*, 62 F.4th at 1161 (causation chain does not fail solely because there are several links or a third party's actions intervened). Likewise, "[f]or purposes of the CLRA, causation is sufficiently alleged where the facts plausibly suggest that the defendant's misrepresentation 'played a substantial part, and so has been a substantial factor' in influencing plaintiff's actions which in turn, led to his harm." *Doe 1 v. AOL, LLC*, 719 F. Supp. 2d 1102, 1113 (N.D. Cal. 2010).

These causation principles have deep roots, as illustrated in *Am. Philatelic Soc. v. Claibourne*, 3 Cal. 2d 689 (1935). In *Claibourne*, defendant perforated stamps to simulate rare, valuable government perforated stamps. Defendant did not himself seek to defraud. Instead, he offered to sell the fake stamps (whose inauthenticity could only be detected by experts) to dealers at a modest profit, suggesting that "large profits can be made by buying these spurious stamps and selling them to prospective purchases as genuine government perforated stamps." *Id.* at 695. Owners, collectors and dealers in the genuine stamps sought to enjoin defendant's practices under the UCL, alleging the practice would cause them pecuniary injury by reducing the value of the genuine stamps. Pertinent here, the California Supreme Court held that it was "wholly immaterial" that defendant left the "actual fraud, double-dealing and palming off" to others. *Id.* at 697. He who "furnishes the means to commit fraud" is equally liable for the harm caused. *Id.*

These principles are equally applicable today. In *O'Handley*, plaintiff alleged California's Secretary of State regularly flagged his posts on Twitter, which led Twitter to remove the posts, limit other users' access to his account, and ultimately to suspend his account. 62 F.4th at 1153. Plaintiff's alleged injury was his inability to communicate with his followers and pursue the profession of a social media influencer. *Id.* at 1161. The Ninth Circuit held that plaintiff met the traceability requirement of Article III standing. "Despite the distance between Secretary Weber's actions and O'Handley's alleged injuries" "it is possible to draw a causal line from the OEC's flagging of the [] post to O'Handley's suspension from the platform, even if it is one with several twists and turns." *Id.* at 1161–62.

Apple does not undermine these principles of causation and traceability. It cites no authority that standing requires defendant's conduct to be the only or ultimate cause of Plaintiffs' harm. Its

BLOOD HURST & O' REARDON, LLP

cases are simply inapposite. MTD at 7–9. In *May v. Google LLC*, No. 24-cv-01314-BLF, 2024 U.S. Dist. LEXIS 200398 (N.D. Cal. Nov. 4, 2024), scammers induced plaintiffs to purchase Google Play gift cards and reveal the card codes to the scammers. Plaintiffs sued Google for failure to warn about gift card scams, alleging "if the packaging had clearly warned about gift card scams" plaintiffs would not have bought Google gift cards. *Id*. at *9. Tellingly, "Plaintiffs d[id] not allege that Google . . . ma[de] false representations." *Id*. at *14. In contrast here, Apple's affirmative conduct, its false representations, caused Plaintiffs' financial losses.

In *In re Firearm Cases*, 126 Cal. App. 4th 959 (2005), plaintiffs had no evidence at summary judgment that "any defendant's act or omission caused any criminal to acquire a firearm" *i.e.*, the alleged harm. *Id*. at 974. Without any "evidence of a factual nexus between any defendant" and the alleged harm (criminals' purchase or use of defendants' guns) summary judgment was appropriate. *Id.*

In *Graham v. Bank of Am. N.A.*, 226 Cal. App. 4th 594 (2014), plaintiff's fraud and UCL claims were deficient for multiple reasons. Among other defects, plaintiff challenged a non-actionable opinion of a future event (not a representation about past or existing facts) and failed to allege causation because his harm was caused by a "decline in the overall [housing] market" rather than any conduct by a defendant. *Id.* at 607, 609. In contrast here, Plaintiffs' harm was caused by Apple's misrepresentations of existing facts, which Plaintiffs relied upon to their detriment.

In *Lorenzo v. Qualcomm Inc.*, No. 08cv2124 WQH (LSP), 2009 U.S. Dist. LEXIS 69843 (S.D. Cal. Aug. 10, 2009), the plaintiff was the indirect consumer/purchaser of a cell phone equipped with Qualcomm technology. He sued Qualcomm for antitrust and UCL violations based on licensing statements Qualcomm made to third party organizations. The representations were not made to plaintiff, nor did she allege reliance upon them. *Id.* at *14–15. The UCL claim failed because the alleged harm was too remote to support standing. There were at least three intermediaries between the supracompetitive price plaintiff allegedly paid and Qualcomm's misrepresentations to third parties: chipset manufacturers, device manufacturers and device vendors. *Id.* at *10, 19. In addition, plaintiff did not allege any facts to support a finding that even if she had paid a supracompetitive price, that the higher price could be traced to Qualcomm. *Id.* at *19.

BLOOD HURST & O' REARDON, LLP

00224670

The other cases mentioned by Apple are equally impertinent. *See Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1144 (2020) (no standing because plaintiff's product purchase was motivated by reasons completely different from the challenged representations); *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1018–22 (N.D. Cal. 2013) (on summary judgment, no causation/standing because evidence showed (i) misrepresentations were made after product purchase, (ii) no reliance on the representations, and (iii) no connection between representation and the harm of reduced battery capacity); *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 154 (2018) (no causation because car crash injuries were caused by the other driver's willful inattention, not by iPhone design).

### 2.    Plaintiffs Properly Plead Reliance

Article III, the UCL, and the CLRA have no reliance requirement for standing; they have traceability or causation requirements. However, in UCL and CLRA misrepresentation cases the causal mechanism is generally articulated in terms of reliance, often shown by materiality. *Cal. Med.*, 14 Cal. 5th at 1096–97.

Apple argues Plaintiffs lack standing because they "have not plausibly alleged that they saw Apple's purported representations about the App Store and took some detrimental action based on what they saw." MTD at 9. The Complaint demonstrates otherwise. Plaintiffs each allege that they relied on Apple's representations that apps from the App Store were legitimate, vetted, and trustworthy and that based on these assurances Plaintiffs bought their iPhones and downloaded the cryptocurrency trading apps at issue here.

Plaintiffs' reliance was two-pronged. First, Plaintiffs relied on Apple's representations on its App Store. The Complaint states these representations verbatim. ¶ 25. By way of example, under the heading "**Dedicated to trust and safety**" Apple promises: "Apps must adhere to our guidelines. . . . Which is why human App Reviewers ensure that the apps on the App Store adhere to our strict app review standards. Our App Store Review Guidelines require apps to be safe, provide a good user experience . . . and use approved business models." *Id.* Below these statements, Apple provides a direct link to its "App Store Review Guidelines." *Id.* In the adjacent box, in large, bold

BLOOD HURST & O' REARDON, LLP

00224670

letters Apple promises: "Every week, over 500 dedicated experts around the world review over 100k apps." ¶¶ 25, 29.

Plaintiffs each allege that he or she "was assured by ***Apple's representations on its App Store*** that its apps could be trusted and were secure and safe as alleged above. In reliance on . . . Apple's representations regarding the safety and security of App Store apps . . . Kapil downloaded Digicoins from the App Store in or around the month of August 2023, and began transferring money and buying cryptocurrency he believed he could use to conduct legitimate digital trades on the Digicoins app." ¶¶ 47, 52 (Gomez), 57 (Sallen).

Plaintiff Kapil also reviewed and relied on App Store Review Guidelines referenced in and linked via the App Store, "including the particular standards Apple purportedly requires for cryptocurrency exchange apps." ¶ 48. The App Store Review Guidelines assured Kapil that apps facilitating Initial Coin Offerings ("ICOs"), such as Digicoins, will "come from established banks, securities firms . . . or other approved financial institutions" and will "comply with all applicable law." ¶ 30. Apple promised that apps that "facilitate transactions or transmissions of cryptocurrency" will do so on an approved exchange and in regions "where the app has appropriate licensing and permissions to provide cryptocurrency exchange." *Id.* And that as part of Apple's vetting and review process "[a]pps that provide services in highly regulated fields" such as financial services or that require sensitive user information must be submitted by a legal entity that provides the services, not by an individual developer. ¶ 31. Kapil relied on Apple's representations, which it turned out, were false. ¶¶ 48–49. The apps were not, *inter alia*, licensed to provide cryptocurrency exchanges and the ICOs were not from an approved financial institution permitted to issue ICOs. ¶ 42.

Second, in addition to relying on Apple's specific statements made on the App Store, each Plaintiff "trusted apps from the App Store because of his experience with Apple products, his experience downloading and using other apps on the App Store, and the overall impression Apple has cultivated among its customers—that apps on the App Store are legitimate, vetted, and trustworthy. This confidence arose from Apple's long-standing commitment to marketing the App Store as a secure platform, where all apps meet rigorous safety standards." ¶¶ 47 (Kapil), 52

BLOOD HURST & O' REARDON, LLP

(Gomez), 57 (Sallen). Indeed, Apple's business model and sales depend upon the perception that App Store apps are safe because Apple does not permit iPhone/iPad owners to download apps except from the App Store. ¶¶ 20, 35, 36. If App Store apps are not perceived to be safe, the sales and value of iPhones and iPads will be negatively impacted. ¶ 36. Each Plaintiff has used Apple products for decades and trusted the legitimacy of the trading apps not only because of the specific promises discussed above, but also because of Apple's long-term marketing regarding the safety and legitimacy of its apps. Plaintiffs would not have used the cryptocurrency apps from the App Store or bought or paid what they did for their iPhones if they had known App Store apps could not be trusted and were not vetted as promised. ¶¶ 47, 52, 57, 87, 89. Plaintiffs have standing to challenge Apple's alleged misconduct.

Apple's "lack of reliance" standing arguments are readily answered. First, it decries that Plaintiffs have not alleged "any specific Apple statements about app safety or security" they relied on but make only "vague allegations." MTD at 10–11. That is not true. Plaintiffs set forth verbatim the safety, security, and vetting representations they relied upon. ¶¶ 17, 21–22, 24–26, 28–29, 32. Plaintiff Kapil additionally sets out his reliance on specific cryptocurrency vetting and legitimacy representations from the App Store Review Guidelines. ¶¶ 30–31.

Second, Apple argues that because Plaintiffs do not allege reliance on specific representations (they do), Plaintiffs can only establish reliance via Apple's long-term marketing of the App Store as a secure platform. It argues Apple's long-term campaign is not sufficiently alleged; that the complaint is "devoid of any details concerning the *extent* of the 'campaign,'" how often the statements were made, or if they were available in other media beyond Apple's website. MTD at 11–12 (emphasis original). It asserts that Plaintiffs point only to statements by Steve Jobs in 2007 and 2024 App Store representations. *Id.*

There are no "bright line rules" on how a long-term marketing campaign must be alleged. *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1048 (N.D. Cal. 2014). Plaintiffs allege that "Apple has worked for decades to build and promote a reputation of providing apps that are safe and can be trusted." ¶ 18. Apple itself states: "For over a decade, the App Store has proven to be a safe and trusted place to discover and download apps." ¶ 17. The quoted statements from the App Store were

BLOOD HURST & O' REARDON, LLP

00224670

1    at all times publicly available to anyone with a computer or smart phone. *Opperman*, 87 F. Supp.

2    3d at 1048 (the campaign should be sufficiently lengthy in duration and widespread in

3    dissemination); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 205–07

4    (1983) (superseded on other grounds) (four-year campaign on television daily); *Morgan v. AT&T*

5    *Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1285 (2009) (campaign took place "over many

6    months"). Plaintiffs also alleged that the perceived safety and trustworthiness of Apple apps is vital

7    to Apple's business model. ¶¶ 35–36, 82.

8        The App Store statements from 2024 reproduced in the Complaint are representative of

9    Apple's long campaign and were quoted because they were the most recent iteration when the

10   Complaint was filed. There is not a 14-year gap as Apple suggests. Apple's safety representations

11   have not materially changed since Steve Jobs promised in 2007 that Apple's "amazing software

12   platform" would "protect[] consumers." ¶ 23; *Children's Television*, 35 Cal. 3d at 218 (plaintiffs

13   should "set out or attach a representative selection of advertisements"); *Opperman*, 87 F. Supp. 3d

14   at 1049 (plaintiff should describe or attach a representative sample). A representative sample is a

15   "reasonable accommodation" between sufficient specificity because "the court can ascertain for

16   itself if the representations were in fact material and of an actionable nature" while "avoiding

17   pleading requirements so burdensome as to preclude relief in cases involving multiple

18   representations." *Children's Television*, 35 Cal. 3d at 218. Finally, Plaintiffs allege that they were

19   exposed to the campaign when they bought their current iPhones and before they downloaded the

20   cryptocurrency apps at issue here. ¶¶ 47, 52, 57; *Opperman*, 87 F. Supp. 3d at 1051 (the court should

21   be able to determine when plaintiff made her purchase or otherwise relied in relation to the alleged

22   campaign).

23       Third, Apple argues Plaintiffs lack standing because they have not alleged the specific

24   statements they saw or relied on before purchasing their iPhones. MTD at 10. As the Complaint

25   shows, this is not true. Moreover, when "plaintiff alleges exposure to a long-term campaign, the

26   plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on

27   particular advertisements or statements." *In re Tobacco II*, 46 Cal. 4th at 328. Plaintiffs allege that

28   they bought their current iPhones in reliance on "Apple's long-standing commitment to marketing

BLOOD HURST & O' REARDON, LLP

1   the App Store as a secure platform, where all apps meet rigorous safety standards." ¶¶ 47, 52, 57.

2   Plaintiffs' allegations are sufficient to establish causation for standing.

### 3.    Plaintiffs Have Standing Under the CLRA

4   Apple expressly acknowledges that Plaintiffs assert two theories of liability: (1) that Apple's

5   representations that its apps were safe, legitimate, and vetted led Plaintiffs to download the scam

6   apps; and (2) that Apple's same representations caused Plaintiffs to overpay for their iPhones. MTD

7   at 6; *id.* at 2 (Plaintiffs "seek equitable relief and actual damages in the form of their investment

8   losses and the money they allegedly overpaid for their iPhones."); *see also* ¶¶ 81, 87. Yet, in its next

9   breath Apple asserts Plaintiffs "are really complaining about the scam crypto apps" and the resulting

10  investment losses, *not* the reduced value of their iPhones. MTD at 12. It concludes that if the

11  Complaint is narrowed as Apple proposes, the CLRA claim fails because the scam apps were not

12  for "sale or lease," they were downloaded for free. *Id.* at 13.

13  "A plaintiff is the master of his complaint and responsible for articulating cognizable

14  claims." *Newtok Vill. v. Patrick*, 21 F.4th 608, 616 (9th Cir. 2021). Plaintiffs have alleged cognizable

15  violations of the CLRA because Apple's misrepresentations regarding the safety of its apps resulted

16  in Plaintiffs' purchase of iPhones. ¶¶ 87–89; Cal. Civ. Code § 1770(a) (the CLRA prohibits as

17  unlawful "unfair or deceptive acts or practices . . . which result in the sale or lease of goods or

18  services").

### B.    Plaintiffs Sufficiently Plead Their Claims

20  Under Rule 12(b)(6), Plaintiffs need only "state a claim to relief that is plausible on its face."

21  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To defeat the motion to dismiss, Plaintiffs'

22  allegations must "suggest that the claim has at least a plausible chance of success" and allege

23  "factual content that allows the court to draw the reasonable inference that the defendant is liable

24  for the misconduct alleged." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). "All

25  allegations of material fact in the complaint are taken as true and construed in the light most

26  favorable to Plaintiffs." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1016 (9th Cir. 2020).

27  Federal Rule of Civil Procedure 9(b) requires a claim grounded in fraud to be pled with

28  particularity. *In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig.*, 2012

BLOOD HURST & O' REARDON, LLP

1    U.S. Dist. LEXIS 172869, at *12 (C.D. Cal. Dec. 3, 2012). A pleading satisfies Rule 9(b) if it

2    identifies "'the circumstances constituting fraud so that the defendant can prepare an adequate

3    answer from the allegations.'" *Id.* at *13 (quoting *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th

4    Cir. 1973)). "Averments of fraud must be accompanied by 'the who, what, when, where, and how'

5    of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). Rule

6    9(b)'s heightened pleading requirement applies to UCL and CLRA claims when those claims sound

7    in fraud. *Id.* at 1125. As the same standard governs claims under both statutes, courts often analyze

8    them together. *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017).

         **1.    Plaintiffs' Allegations Satisfy Rule 9(b)**

10            **a.    Plaintiffs Plead Their Claims with Particularity**

11           Plaintiffs UCL and CLRA claims notify Apple of the "who, what, when, where, and how"

12   of the fraudulent conduct at issue. Plaintiffs allege Apple (*who*) represents "apps in its App Store

13   had been vetted and reviewed by Apple and were safe and secure" and that cryptocurrency apps

14   meet additional requirements and security standards, including coming from approved financial

15   institutions and complying with licensing requirements, among others (*what*). ¶¶ 1, 21, 30, 44.

16   Plaintiffs allege they viewed representations about app vetting and safety on the App Store itself,

17   ¶¶ 47, 52, 57, and that they were exposed to and familiar with Apple's representations about app

18   vetting and safety through its long-term marketing efforts touting the safety and legitimacy of apps

19   through the App Store, including during their previous experiences owning Apple devices and using

20   the App Store (*where*, *when*). *See, e.g.*, ¶¶ 5, 47, 52, 57. Plaintiffs also identify specific instances of

21   Apple's representations about the safety of apps in the App Store of the type they relied upon before

22   purchasing their Apple devices and using the scam cryptocurrency apps (*what*). *E.g.*, ¶¶ 17 (apps

23   "are held to the highest standards for privacy, security, and content"), 22–26 ("Our App Store

24   Review Guidelines require apps to be safe . . . and use approved business models."), 28 ("Customer

25   trust is a cornerstone of the App ecosystem. Apps should never prey on users or attempt to rip off

26   customers."), 29–30 ("Apps facilitating . . . crypto-securities or quasi-securities trading must come

27   from established banks, securities firms . . . or other approved financial institutions and must comply

28   with all applicable law."), 31–32.

BLOOD HURST & O' REARDON, LLP

15                    Case No. 5:24-cv-09304-NW

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Additionally, Plaintiff Kapil alleges he "reviewed Apple's guidelines and review process for apps available from the App Store, including the particular standards Apple purportedly requires for cryptocurrency exchange apps" (*where*) before beginning to transfer large amounts to the Digicoins app, and that he relied on these representations to determine "the Digicoins app was safe for his investments." ¶ 48. Kapil reviewed the App Review Guidelines between August of 2023 (when he downloaded the app) and January of 2024 (when he had transferred over $1,236,000 to the Digicoins app) (*when*). ¶¶ 47–49. Plaintiff Gomez contacted Apple directly via Apple chat and spoke with an Apple representative on November 30, 2023 (*when*), about her concerns with the SolLuna app and was assured that "apps from the App Store were all tested and vetted for legitimacy and authenticity, and that she could safely continue to use the SolLuna app" (*where*, *what*). ¶ 53. In reliance on this assurance directly from Apple as well as, *inter alia*, Apple's representations in the App Store, Gomez transferred $10,000 to the SolLuna app to pay "taxes" she ostensibly owed despite her misgivings about the app's legitimacy. ¶¶ 53–54. These allegations are more than sufficient to meet Rule 9(b)'s heightened standard. *See Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 914–916, 920–21, 923–24 (N.D. Cal. 2013).

Contrary to Apple's assertions, Plaintiffs also adequately plead the false or misleading nature of Apple's misrepresentations. *See* MTD at 14–17. Plaintiffs allege that Apple's representations about the safety and vetting of apps on the App Store are false or misleading because Apple "fails to adequately vet predatory, potentially devastating 'pig butchering' cryptocurrency scam apps and makes them available to download," authorizes and maintains malicious apps that enable the theft of personal financial assets, and allowed fraudsters to place the scam cryptocurrency apps at issue in the App Store despite representing that cryptocurrency apps "meet all relevant legal requirements" (*how*). *E.g.*, ¶¶ 1, 44, 77; *see also* Section III.B.1.b., *infra*.

Plaintiffs also plead their UCL and CLRA claims with the required particularity because they "identif[y] a clear common message" in Apple's advertising and representations "and identif[y] numerous examples that repeat this message." *Oreck*, 2012 U.S. Dist. LEXIS 172869, at *42. In *Oreck*, the court held that the plaintiffs had satisfied Rule 9(b) though the complaint did not "specify for each particular lead plaintiff exactly which advertisement that plaintiff viewed and exactly which

BLOOD HURST & O' REARDON, LLP

00224670

1    statements in the advertisement that plaintiff relied upon" because plaintiffs alleged they "were

2    exposed to a national advertising campaign . . . articulating a common allegedly fraudulent

3    message" and plaintiffs alleged the type of advertising they viewed. *Oreck*, 2012 U.S. Dist. LEXIS

4    172869, at *41. The court found "it would be unfair to require plaintiffs to recall and specify

5    precisely which of the many advertisements they [sic] saw were the particular advertisements they

6    relied upon" and it was sufficient "for plaintiffs to provide examples of advertisements similar to

7    those they saw as long as all the advertisements convey the core allegedly fraudulent message." *Id.*

8    at *42.

9        Here, Plaintiffs similarly identify the "core message" of decades of Apple's representations

10   regarding the App Store—that apps are heavily vetted for safety and legitimacy and can be trusted—

11   and provide specific examples of those representations they viewed. *E.g.*, ¶¶ 2 ("Apple has actively

12   and extensively represented to consumers that apps on the App Store are thoroughly vetted,

13   trustworthy, and secure."), 18 ("Over time, Apple has established an image that its App Store is

14   carefully curated, with each app undergoing a rigorous review to ensure it meets Apple's security

15   standards."), 33 ("Apple's representations of safety and security in the applications offered in the

16   App Store have been made continuously for almost two decades and were a focal point of

17   widespread advertising and marketing representations made by Apple."); *see also* ¶¶ 17, 23–26, 28–

18   32 (specific representations). Thus, Plaintiffs' allegations are sufficient to give Apple adequate

19   notice and satisfy Rule 9(b). *Oreck*, 2012 U.S. Dist. LEXIS 172869, at *43; *Sihler v. Fulfillment

20   Lab, Inc.*, 2020 U.S. Dist. LEXIS 230404, at *48–49 (S.D. Cal. Dec. 8, 2020); *Loomis v. Slendertone

21   Distrib., Inc.*, 420 F. Supp. 3d 1046, 1079 (S.D. Cal. 2019); *Morrison v. Trivita, Inc.*, 2013 U.S.

22   Dist. LEXIS 38357, at *13 (S.D. Cal. Mar. 18, 2013).

23       Apple also asserts Plaintiffs fail to sufficiently plead actionable omissions or Apple's duty

24   to disclose information. MTD at 17–19. Apple's argument is flawed in the first instance because the

25   gravamen of Plaintiffs' Complaint is not that Apple failed to disclose the specific apps Plaintiffs

26   downloaded were scams, but that Apple "fails to adequately vet predatory, potentially devastating

27   'pig butchering' cryptocurrency scam apps and makes them available to download despite its

28   continuing misrepresentations that the apps in its App Store are vetted, safe and trustworthy." ¶ 77;

17                                                        Case No. 5:24-cv-09304-NW

1    *see also* ¶ 1. In any event, Apple's argument fails because Plaintiffs do not "hang [their] claims on

2    Apple's silence;" rather, they base each of their claims "on Apple's decision to speak in an allegedly

3    misleading manner." *Pirozzi*, 966 F. Supp. 2d at 921. The portions of the Complaint Apple cites

4    illustrate this clearly. ¶ 81 ("As a result of Defendant's misconduct and representations . . ."), 87

5    (". . . would not have paid as much for them if Apple disclosed that the *representations discussed*

6    *herein were false and misleading*" (emphasis added)). Therefore, Apple's omissions-based

7    arguments provide no basis to dismiss Plaintiffs' well-pleaded Complaint.

8              **b.    Plaintiffs Adequately Plead the False or Misleading Nature of**
                      **Apple's Representations**
9

10            Apple asserts Plaintiffs do not allege what is false or misleading about the representations

11    Plaintiffs specifically allege or why they are misleading. MTD at 14. That is not so. Plaintiffs

12    specifically allege "Apple's affirmative representations and the general impression that it has

13    cultivated that apps from its App Store could be trusted and were safe and secure because of Apple's

14    rigorous vetting and review process were false and misleading." ¶ 6. Apple's representations as

15    alleged in the Complaint are false or misleading because "Apple authorized and maintained

16    malicious applications in its 'App Store' that allowed the theft of personal financial assets while

17    representing that apps in its App Store had been vetted and reviewed by Apple and were safe and

18    secure." ¶ 1. Further, Plaintiffs allege Apple "promotes and represents that its App Store apps which

19    are used for cryptocurrency transmissions or transactions are appropriately licensed and that apps

20    facilitating cryptocurrency ICOs (Initial Coin Offerings) or other futures trading of cryptocurrency

21    come from approved financial institutions and comply with all applicable laws" and that "App Store

22    apps used to trade cryptocurrency meet all relevant legal requirements," but Apple does not in fact

23    require purported cryptocurrency exchange apps to meet these requirements or properly vet them.

24    ¶¶ 21, 30, 44, 77, 90. Plaintiffs' Complaint is clear that Apple's representations are false or

25    misleading because Apple represents that its review process ensures the safety and trustworthiness

26    of apps in the App Store, but in reality "Apple fails to adequately vet predatory, potentially

27    devastating 'pig butchering' cryptocurrency scam apps and makes them available to download."

28    ¶ 77.

BLOOD HURST & O' REARDON, LLP

1      Rather than arguing Plaintiffs do not meet Rule 9(b)'s pleading standard, Apple's argument

2   is really that a reasonable consumer would not find Apple's representations misleading. MTD at

3   14–15 (arguing certain statements "would lead a reasonable consumer to believe that Apple does its

4   best to protect against viruses and malware"), 17 (arguing "any conceivable consumer confusion

5   would have been wiped away by the broader context of all the other statements explaining what App

6   Store safety and security actually mean"). This argument is not ripe for decision on a motion to

7   dismiss. Plaintiffs' claims under the UCL and CLRA are both "governed by the 'reasonable

8   consumer' test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). The reasonable

9   consumer test "raises questions of fact that are appropriate for resolution on a motion to dismiss

10  only in 'rare situation[s].'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015) (quoting

11  *Williams*, 552 F.3d at 938); *In re NJOY Consumer Class Action Litig.*, 2014 U.S. Dist. LEXIS

12  196586, at \*26 (C.D. Cal. May 27, 2014) ("At the motion to dismiss stage, the court can dismiss a

13  complaint for failure to state a claim only where it can 'conclude as a matter of law that members

14  of the public are not likely to be deceived by the [advertisement].'"). Apple's argument regarding

15  the understanding of reasonable consumers is not appropriate for decision at this time.

16      While Apple's argument is premature, it fails in any event because the allegations in

17  Plaintiffs' well-pleaded Complaint are sufficient to satisfy the reasonable consumer test. The

18  reasonable consumer test "requires a plaintiff to show that members of the public are likely to be

19  deceived by the business practice or advertising at issue." *Doe v. Successfulmatch.com*, 70 F. Supp.

20  3d 1066, 1077 (N.D. Cal. 2014). Apple represents apps in the App Store as heavily vetted for safety

21  and legitimacy, including representing that it holds apps "to the highest standards for privacy,

22  security, and content," that consumers can "Download with confidence," that Apple "ensure[s] apps

23  come from known sources," that apps must "use approved business models," and that apps "should

24  never prey on users or attempt to rip off customers." ¶¶ 17, 22, 25, 26, 28. Plaintiffs allege these and

25  other similar representations reasonably lead consumers to believe apps in the App Store, especially

26  apps in highly regulated fields like finance, have been vetted for safety issues like pig butchering

27  schemes, when in fact they are not. *E.g.*, ¶¶ 1, 6. 19, 21, 77, 90. Indeed, Plaintiffs allege scammers

28

BLOOD HURST & O' REARDON, LLP

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

(including those behind the apps at issue here) specifically publish pig butchering apps in the App Store to make them appear legitimate. ¶¶ 34, 39.

That some of Apple's representations specifically discuss viruses or malware only reinforces a reasonable consumer's belief that Apple takes steps to prevent fraudulent pig butchering apps from appearing in the App Store. *See* MTD at 15–16. In light of Apple's long-standing representations about the safety of and review process for apps on the App Store, no reasonable consumer would believe Apple employs extensive measures to prevent safety issues like viruses and malware but stops short of addressing well-known and prevalent pig butchering scams. *See* ¶¶ 19, 34, 43–44 (alleging Apple had knowledge of pig butchering scams); *see also In re NJOY*, 2014 U.S. Dist. LEXIS 196586, at *26–27 ("Even assuming . . . that some of the statements would themselves be non-actionable, they 'cannot be considered in isolation because they contribute to the [potentially] deceptive context' of the packaging and marketing 'as a whole.'"). Indeed, Apple explicitly states in the App Review Guidelines that "apps that solicit, promote, or encourage criminal or clearly reckless behavior will be rejected."[4] That Apple's App Review Guidelines are published on a "subdomain directed at *app developers*," MTD at 15 (emphasis in original), is irrelevant since the Guidelines are linked from and readily available to consumers from the App Store itself. ¶ 25 (screenshot of App Store page with link to App Review Guidelines). Apple has not shown how or why the Guidelines' location would prevent a reasonable consumer from believing Apple takes appropriate steps to prevent fraudulent apps from appearing in the App Store.

### 2. Plaintiffs Sufficiently Allege Predicate Violations to State an Unlawful UCL Claim

Plaintiffs' claims under the UCL's unlawful prong survive because their pleadings adequately establish a predicate violation of law. To state a claim under the unlawful prong of the UCL, "it is not necessary that plaintiffs allege violation of the predicate laws with particularity; they must at a minimum, however, identify the statutory or regulatory provisions that defendants

---

[4]    *App Review Guidelines*, Apple, https://developer.apple.com/app-store/review/guidelines (last accessed Apr. 2, 2025); *see also* MTD at 16 n.1 ("The Court may consider the entirety of the App Review Guidelines in ruling on this motion.").

00224670

allegedly violated." *In re Actimmune Mktg. Litig.*, 2009 U.S. Dist. LEXIS 103408, at \*45–46 (N.D. Cal. Nov. 6, 2009). Rather, Plaintiffs "must allege facts that, if proven, would demonstrate that Defendant's conduct violated another, underlying law." *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 984 (N.D. Cal. 2014). As demonstrated herein, Plaintiffs have stated a predicate violation under the CLRA, which is sufficient to maintain their unlawful UCL claim. *Pirozzi*, 966 F. Supp. 2d at 922 (holding unlawful UCL claim survived based on CLRA claim). Plaintiffs have also sufficiently established their reliance on Apple's fraudulent or misleading statements, as required by additional predicate claims. *E.g.*, ¶¶ 38, 47–49, 52, 55, 57, 60, 80; *see* Section III.B.1., *supra*; *see also Shin v. Campbell Soup Co.*, 2018 U.S. Dist. LEXIS 228058, at \*13–14 (C.D. Cal. June 11, 2018). As Plaintiffs' Complaint adequately alleges at least one predicate violation, they state a claim under the UCL's unlawful prong.

### C.    Plaintiffs Properly Seek Restitution and Injunctive Relief

#### 1.    Restitution

Apple cites *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), and argues that Plaintiffs cannot seek equitable relief under the UCL or CLRA because they have an adequate remedy at law. MTD at 20. Apple is incorrect for several reasons.

First, the remedies afforded by the UCL and CLRA are in addition to any available legal remedies. *See* Cal. Bus. & Prof. Code § 17205 (UCL); Cal. Civ. Code §§ 1752, 1780(a) (CLRA); *see also Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1114 (N.D. Cal. 2020) ("The equitable remedies afforded by the UCL and CLRA are expressly stated to be in addition to other available remedies at law.").

Second, the equitable relief Plaintiffs seek is primarily injunctive relief, which Plaintiffs may properly seek to enjoin Apple's future conduct continuing to misrepresent that the apps from its App Store are rigorously vetted for safety and security and that each app on the App Store has met its security standards. Monetary damages, alone, would be inadequate. *See Hayden v. Retail Equation, Inc.*, 2022 U.S. Dist. LEXIS 142010, at \*12–13 (C.D. Cal. July 22, 2022); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 926 (N.D. Cal. 2023) ("Google argues that plaintiffs cannot show that the risk

BLOOD HURST & O' REARDON, LLP

1   of harm is sufficiently imminent and substantial to confer standing for injunctive relief. The Court

2   disagrees. Google's conduct has not stopped.").

3       Third, even if equitable remedies such as restitution would overlap with Plaintiffs' claims

4   for damages, Plaintiffs may bring their claims for equitable relief in the alternative. In fact, the

5   "majority of courts in this district" have held that *Sonner* does not require dismissal of equitable

6   claims at the pleading stage. *In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1012–13

7   (N.D. Cal. 2023) (collecting cases); *Steiner v. Vi-Jon Inc.*, 723 F. Supp. 3d 784, 795 (N.D. Cal.

8   2024) (collecting cases and stating, "[c]ourts in this district [] typically permit the pursuit of

9   alternative remedies at the pleadings stage"); *Libman v. Apple, Inc.*, 2024 U.S. Dist. LEXIS 175118,

10  at *68 (N.D. Cal. Sept. 26, 2024) (same); *Freeman*, 443 F. Supp. 3d at 1114; *Summit Est., Inc. v.

11  United Healthcare Ins. Co.*, 2020 U.S. Dist. LEXIS 166721, at *24–25 (N.D. Cal. Sept. 10, 2020)

12  ("[A]llowing a plaintiff to plead a claim for injunctive relief under the UCL in the alternative to

13  claims for legal remedies is consistent with the broad remedial purpose of the UCL, and is also

14  consistent with Section 17205 of the UCL, which provides that UCL remedies are 'cumulative' to

15  other available remedies.").[5] The Ninth Circuit has held that claims can be pled even if duplicative

16  or superfluous. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762–63 (9th Cir. 2015); *Moyle

17  v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 962 (9th Cir. 2016). The Court should allow

18  Plaintiffs' equitable claims to proceed at this early stage of litigation.[6]

19      Next, Apple argues Plaintiffs may not seek restitution from Apple for their loss of

20  cryptocurrency because Apple did not receive any of the stolen funds. MTD at 20. This ignores the

21

22  [5]     *See also Haas v. Travelex Ins. Servs.*, 555 F. Supp. 3d 970, 980 (C.D. Cal. 2021) (*Sonner*
23  "cannot be read as reversing a clearly established circuit practice allowing plaintiffs to plead in the
    alternative at the earliest stages of litigation"); *Sagastume v. Psychemedics Corp.*, 2020 U.S. Dist.
24  LEXIS 247754, at *21 (C.D. Cal. Nov. 30, 2020) ("*Sonner* does not hold that plaintiffs may not
    seek alternative remedies at the pleading stage.").
25  [6]     If the Court dismisses Plaintiffs' equitable claims under *Sonner*, it should be without
    prejudice for refiling in state court. *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1314–15 (9th
26  Cir. 2022) (district court that lacked equitable jurisdiction over a UCL claim should have dismissed
    the claim without prejudice for "refiling the same case in state court"); *see also J.J. v. Ashlynn Mktg.
27  Grp., Inc.*, 749 F. Supp. 3d 1086, 1101 (S.D. Cal. 2024) (citing *Guzman* and dismissing UCL claims
    without prejudice for refiling in state court); *Granato v. Apple Inc.*, 2023 U.S. Dist. LEXIS 124318,
28  at *17 (N.D. Cal. July 19, 2023) (same).

1   reality that Apple's deceptive representations caused Plaintiffs' harm. As alleged in detail, Apple's

2   assertions regarding the App Store's safety created a false sense of security, directly leading

3   Plaintiffs to download the fraudulent apps from Apple and invest substantial sums. ¶¶ 17–19, 21–

4   22, 28, 34–35, 38, 40. This reliance on Apple's representations was a substantial factor in their

5   decisions to engage with the App Store apps and make financial investments. ¶¶ 40, 47–49, 52–55,

6   57–60, 81. The fact that Apple did not directly receive the stolen funds is irrelevant; restitution is

7   based on Apple's wrongful conduct and the resulting loss to Plaintiffs.

8       There is no requirement that the lost money be tied to a transaction with defendant. A

9   plaintiff must merely allege "an identifiable monetary or property injury." *Kwikset Corp.*, 51 Cal.

10  4th at 325. Restitution is the "return [of] money obtained through an unfair business practice to those

11  persons in interest from whom the property was taken, that is, to persons who had an ownership

12  interest in the property or those claiming through that person." *Korea Supply Co. v. Lockheed Martin*

13  *Corp.*, 29 Cal. 4th 1134, 1144 (2003). Contrary to Apple's argument, UCL and CLRA restitution

14  claims are not limited to direct purchases as a matter of law. In *Shersher v. Superior Court*, the

15  California Court of Appeal held that "[n]othing in *Korea Supply* conditions the recovery of

16  restitution on the plaintiff having made direct payments to a defendant who is alleged to have

17  engaged in . . . unlawful practices under the UCL." 154 Cal. App. 4th 1491, 1493 (2007). "Rather,

18  the holding of *Korea Supply* on the issue of restitution is that the remedy the plaintiff seeks must be

19  truly 'restitutionary in nature'—that is, it must represent the return of money or property the

20  defendant acquired through its unfair practices." *Id.* at 1494. In *Shersher*, the court reinstated the

21  plaintiffs' UCL restitution claim against Microsoft, even though they had purchased the products at

22  issue from third party retailers. *Id.* at 1499–1500; *see also Cabebe v. Nissan N. Am., Inc.*, 2018 U.S.

23  Dist. LEXIS 185017, at *16–17 (N.D. Cal. Oct. 26, 2018) (analyzing *Korea Supply* and *Shersher*

24  and rejecting defendant Nissan's argument that plaintiffs could not seek restitution from Nissan

25  because they purchased the defective vehicles from an Acura dealer and CarMax). The reasoning in

26  *Cabebe* is applicable. Apple was "unjustly enriched as a result of its allegedly unlawful business

27  practices." 2018 U.S. Dist. LEXIS 185017, at *17. Therefore, Plaintiffs properly seek restitution

28  from Apple.

BLOOD HURST & O' REARDON, LLP

1    For the same reason, Apple's argument that because Gomez and Sallen purchased their

2    iPhones from Sprint and Verizon they cannot seek restitution from Apple from overpayment for

3    their iPhones also fails. MTD at 21. Furthermore, Kapil purchased his iPhone directly from Apple

4    who was the direct recipient of his overpayment. ¶ 47. Apple acquired the money Plaintiffs lost

5    when overpaying for their iPhones. Thus, "[a]s a direct result of Apple's" misconduct, Plaintiffs lost

6    both the money invested through their App Store apps and when overpaying for their iPhones that

7    were not as represented. ¶¶ 49, 55, 60.

8                      **2.    Injunctive Relief**

9    Given the ongoing risk of harm, Plaintiffs also properly seek injunctive relief. While Apple

10   points out that three apps have been removed from the App Store, this response fails to address the

11   broader issue of Apple's failure to prevent such fraud in the first place. Apple continues to present

12   itself as a trusted platform, but its inadequate vetting process, despite years of representations to the

13   contrary, leaves Plaintiffs and future consumers vulnerable to similar scams. Plaintiffs are not

14   simply seeking to prevent future harm to themselves, but to prevent the same fraudulent conduct

15   from continuing to affect others in the future.

16   Apple's argument is based on a misguided and tautological premise: that Plaintiffs "do not

17   allege that they intend to download and use the crypto scam apps ever again." MTD at 23. This

18   argument misses the point entirely. Plaintiffs do not claim they would intentionally download a

19   fraudulent app. Instead, the issue is that Apple's ongoing misrepresentations about the safety and

20   security of the App Store—coupled with its inadequate vetting process—create an ongoing risk that

21   Plaintiffs could unknowingly download another scam app in the future. Plaintiffs continue to own

22   iPhones and plan to use the App Store. ¶¶ 82, 95. Despite Apple's claims of stringent vetting, the

23   App Store remains susceptible to malicious scam apps being made available. ¶¶ 72, 77, 82, 95.

24   Apple's failure to implement the promised robust system for preventing fraudulent apps leaves

25   Plaintiffs at risk of falling victim to another scam—through no fault of their own. *Id.* This imminent

26   and realistic danger of further harm justifies the need for injunctive relief to protect future consumers

27   from the same deceptive practices.

28

BLOOD HURST & O' REARDON, LLP

Apple's final argument—that injunctive relief is not necessary because the three scam apps Plaintiffs used are removed and "[s]o there is nothing in Apple's advertising that needs to be corrected"—also fails. MTD at 24. Apple represents that each of the thousands of apps in its App Store are rigorously vetted and have met its security standards. ¶¶ 24, 28. Plaintiffs allege that Apple's ongoing representations about App Store safety and vetting standards are false and misleading. Apple cites *Conrad v. Boiron, Inc.*, 869 F.3d 536, 542–43 (7th Cir. 2017), but there the plaintiff could not obtain redress from an injunction because he was already "fully aware of the fact that [the product at issue] is nothing but sugar water." Similarly, in *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1232 (N.D. Cal. 2022), the defendant "took immediate action to remedy" its misconduct, so "declaratory relief would not motivate [defendant] to change its practices." Here, Apple continues to represent that it ensures the safety and security of the App Store apps. And Apple did not take "immediate action" to correct its practices; instead, it steadfastly maintains that it already does enough. Plaintiffs intend to continue downloading apps from the App Store and desire to trust Apple's representations but need the requested injunctive relief to avoid imminent harm.

## IV.    CONCLUSION

For the reasons stated, Apple's motion should be denied. If the Court grants any aspect of Apple's motion, Plaintiffs request leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

Respectfully submitted,

Dated: April 7, 2025

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
THOMAS J. O'REARDON II (247952)
ADAM M. BUCCI (327312)

By:        *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

00224670

BLOOD HURST & O' REARDON, LLP

lhurst@bholaw.com
toreardon@bholaw.com
abucci@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW (*pro hac vice*)
ANTHONY L. PARKHILL (*pro hac vice*)
205 W. Randolph Street, #1630
Chicago, IL  60606
Tel: 312/621/2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiffs*

Case No. 5:24-cv-09304-NW
PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

BLOOD HURST & O' REARDON, LLP

00224670

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 7, 2025.

*s/ Timothy G. Blood*
TIMOTHY G. BLOOD