1  GIBSON, DUNN & CRUTCHER LLP
   KAHN A. SCOLNICK, SBN 228686
2    kscolnick@gibsondunn.com
   JASON C. LO, SBN 219030
3    jlo@gibsondunn.com
   333 South Grand Avenue
4  Los Angeles, CA 90071
   Telephone:    213.229.7000
5  Facsimile:    213.229.7520

6  GIBSON, DUNN & CRUTCHER LLP
   DANA LYNN CRAIG, SBN 251865
7    dcraig@gibsondunn.com
   One Embarcadero Center, Suite 2600
8  San Francisco, CA 94111-3715
   Telephone:    415.393.8200
9  Facsimile:    415.393.8306

10 *Attorneys for Defendant Apple Inc.*

11             **UNITED STATES DISTRICT COURT**

12             **NORTHERN DISTRICT OF CALIFORNIA**

13                **SAN JOSE DIVISION**

14 SANDEEP KAPIL, GABRIELA GOMEZ,       Lead Case:  5:24-cv-09304-NW
   KIM SALLEN, and DANYELL SHIN on      Member Case: 5:25-cv-05000-NW
15 behalf of themselves and all others similarly
   situated,                           **DEFENDANT APPLE INC.'S NOTICE OF
16                                       MOTION AND MOTION TO DISMISS
                  Plaintiffs,            CONSOLIDATED FIRST AMENDED
17                                       COMPLAINT**
       v.
18                                      Honorable Noël Wise
   APPLE INC.,
19                                      <u>Date</u>:        December 17, 2025 (Dkt. 48)
                  Defendant.           <u>Time</u>:        9:00 a.m.
20                                     <u>Courtroom</u>:   3
21
22                                     <u>Complaint filed</u>:  December 20, 2024
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

1

## NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT

**PLEASE TAKE NOTICE THAT** on December 17, 2025, at 9:00 am PT (Dkt. 48), in Courtroom 3, Fifth Floor, before the Honorable Noël Wise, Defendant Apple Inc., by and through its counsel of record, will and hereby does move under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss plaintiffs' consolidated first amended complaint with prejudice.

The Court dismissed plaintiffs' original complaint on several grounds, and plaintiffs have failed to remedy the fundamental issues the Court identified in its dismissal order. *See* Dkt. 46 at 2–5. Plaintiffs once again fail to plausibly allege that Apple caused their injuries, which precludes them from satisfying the standing requirements of Article III as well as those of the Unfair Competition Law (UCL) and Consumer Legal Remedies Act (CLRA). But even if plaintiffs had standing, they fail to satisfy the heightened pleading requirements of Rule 9(b), since they once again do not plead with particularity what was false or misleading about any of the challenged statements. Their new allegations also introduce new problems for their claims, including running straight into the complete bar on liability provided in Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230, and, as to their new negligent misrepresentation claim, the well-established economic injury rule. Because all of these defects are incurable and any attempt at amendment would be futile, the Court should dismiss this case with prejudice.

This Motion is based on this Notice of Motion; the following Memorandum of Points and Authorities; all documents on file in this action; argument of counsel; and such other matters as the Court may consider.

Dated: September 29, 2025

GIBSON, DUNN & CRUTCHER LLP

*/s/ Kahn A. Scolnick*
Kahn A. Scolnick
*Attorney for Defendant Apple Inc.*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF ISSUES TO BE DECIDED ............................................ 1

III.   FACTUAL BACKGROUND .......................................................................... 2

IV.   LEGAL STANDARD ...................................................................................... 3

V.    ARGUMENT ..................................................................................................... 4

     A.     The new complaint contains the same deficiencies the Court previously identified. .................................................................................................. 4

         1.     Plaintiffs still lack standing to assert their claims. ............................ 4

             a.      Plaintiffs confirm third parties caused them harm, not Apple. .............. 5

             b.      Plaintiffs fail to allege Apple knew of the fraud or assisted in it. ......... 6

             c.      Plaintiffs still cannot plead reliance. ..................................................... 8

         2.     Plaintiffs fail to plead their claims with particularity under Rule 9(b). .......... 11

         3.     Plaintiffs are not entitled to restitution or injunctive relief. ........................... 17

     B.     The negligent misrepresentation claim is barred by the economic loss doctrine. ....... 20

     C.     Section 230 of the Communications Decency Act bars all of plaintiffs' claims. ....... 21

         1.     All of plaintiffs' claims derive from Apple's status as a publisher. ............... 21

         2.     Apple is not liable for its good-faith efforts to monitor third-party content. ....... 25

VI.   CONCLUSION ................................................................................................ 25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ahern v. Apple Inc.*,
411 F. Supp. 3d 541 (N.D. Cal. 2019) ..................................................12, 13, 14, 16

*Alamilla v. Hain Celestial Grp.*,
30 F. Supp. 3d 943 (N.D. Cal. 2014) ...........................................................25

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
625 F. Supp. 3d 971 (N.D. Cal. 2022) .........................................................22

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009)...........................................21, 22, 23, 24, 25

*Barrett v. Apple Inc.*,
523 F. Supp. 3d 1132 (N.D. Cal. 2021) ........................................................6, 7

*Brown v. Madison Reed, Inc.*,
2022 WL 22928877 (N.D. Cal. Jan. 31, 2022) ..........................................10, 11

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003)......................................................................21

*Cetacean Cmty. v. Bush*,
386 F.3d 1169 (9th Cir. 2004).........................................................................3

*Conrad v. Boiron, Inc.*,
869 F.3d 536 (7th Cir. 2017)........................................................................20

*Davidson v. Apple Inc.*,
2017 WL 3149305 (N.D. Cal. July 25, 2017) ..............................................14

*Davidson v. Kimberly-Clark Corporation*,
889 F.3d 956 (9th Cir. 2018).......................................................................19

*Dey v. Robinhood Mkts.*,
780 F. Supp. 3d 882 (N.D. Cal. 2025) .........................................................11

*Diaz v. Intuit, Inc.*,
2018 WL 2215790 (N.D. Cal. May 15, 2018) ..............................................6, 7

*Diep v. Apple Inc.*,
2024 WL 1299995 (9th Cir. Mar. 27, 2024)..............................................12, 23

*Doe 1 v. AOL LLC*,
719 F. Supp. 2d 1102 (N.D. Cal. 2010) .........................................................9

*Doe v. Apple Inc.*,
2025 WL 1266928 (N.D. Cal. May 1, 2025) ..............................................22

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016).....................................................................22, 24

iii

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page

*Drake v. Toyota Motor Corp.*,
2021 WL 2024860 (C.D. Cal. May 17, 2021) ..............................................................18

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019)................................................................................21, 25

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) ...................................................................................15

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024)..........................................................................22, 23, 24

*Fair Hous. Council of San Fernando Valley v. Roommates.com*,
521 F.3d 1157 (9th Cir. 2008) (en banc)....................................................................23

*Fiol v. Doellstedt*,
50 Cal. App. 4th 1318 (1996).....................................................................................7

*In re Firearm Cases*,
126 Cal. App. 4th 959 (2005).....................................................................................5

*In re First Alliance Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006)......................................................................................6

*Goddard v. Google, Inc.*,
640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...........................................................15, 16, 24

*Greenstein v. Noblr Reciprocal Exch.*,
585 F. Supp. 3d 1220 (N.D. Cal. 2022) .....................................................................20

*Hall v. Sea World Ent., Inc.*,
2015 WL 9659911 (S.D. Cal. Dec. 23, 2015)..............................................................10

*Haskins v. Symantec Corp.*,
2014 WL 2450996 (N.D. Cal. June 2, 2014) ................................................................9

*Ibarra v. Pharmagenics LLC*,
660 F. Supp. 3d 914 (C.D. Cal. 2023)........................................................................17

*In re iPhone 4s Consumer Litig.*,
637 F. App'x 414 (9th Cir. 2016) ..............................................................................17

*In re Iphone 4S Consumer Litig.*,
2014 WL 589388 (N.D. Cal. Feb. 14, 2014), *aff'd sub nom.*, 637 F. App'x 414 (9th
Cir. 2016) ..............................................................................................................16

*In re iPhone Application Litig.*,
6 F. Supp. 3d 1004 (N.D. Cal. 2013) ...........................................................................4

*Kalitta Air, L.L.C. v. Central Tex. Airborne Sys., Inc.*,
315 F. App'x 603 (9th Cir. 2008) ..............................................................................20

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009)..................................................................................4, 11

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016)........................................................................................23

*King v. Nat'l Gen. Ins. Co.*,
   2025 WL 2494366 (N.D. Cal. Aug. 29, 2025)..............................................................17

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014)......................................................................................3, 4

*Lemmon v. Snap Inc.*,
   995 F.3d 1085 (9th Cir. 2021)........................................................................................22

*Lorentzen v. Kroger Co.*,
   532 F. Supp. 3d 901 (C.D. Cal. 2021)............................................................................19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...................................................................................................4, 20

*May v. Google LLC*,
   2024 WL 4681604 (N.D. Cal. Nov. 4, 2024)..................................................................5

*Michael v. Honest Co.*,
   2016 WL 8902574 (C.D. Cal. Dec. 6, 2016) ..........................................................20, 21

*Minkler v. Apple Inc.*,
   65 F. Supp. 3d 810 (N.D. Cal. 2014) .......................................................................17, 20

*Moore v. Trader Joe's Co.*,
   4 F.4th 874 (9th Cir. 2021)..............................................................................................15

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001)............................................................................................3

*Oh v. Fresh Bellies, Inc.*,
   2024 WL 4500727 (C.D. Cal. Oct. 15, 2024) ................................................................19

*Opperman v. Path, Inc.*,
   87 F. Supp. 3d 1018 (N.D. Cal. 2014) ...............................................................9, 10, 11

*Pac. Select Fund v. Bank of N.Y. Mellon*,
   2010 WL 11468787 (C.D. Cal. Sept. 20, 2010)..............................................................5

*Paskenta Band of Nomlaki Indians v. Umpqua Bank*,
   846 F. App'x 589 (9th Cir. 2021) ....................................................................................7

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007)........................................................................................21

NOTICE OF MOTION & MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 5:24-cv-09304-NW

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

**Page**

*Phillips v. Apple Inc.*,
2016 WL 1579693 (N.D. Cal. Apr. 19, 2016) ............................................................5, 8

*Price v. Apple Inc.*,
2022 WL 1032472 (N.D. Cal. Apr. 6, 2022) ..................................................................18

*Rasmussen v. Apple Inc.*,
27 F. Supp. 3d 1027 (N.D. Cal. 2014) ..........................................................................13

*Ringler v. J.M. Smucker Co.*,
783 F. Supp. 3d 1229 (C.D. Cal. 2025)..........................................................................19

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
34 Cal. 4th 979 (2004) ..................................................................................................20

*Rutter v. Apple Inc.*,
2022 WL 1443336 (N.D. Cal. May 6, 2022) .................................................................11

*Somers v. Apple Inc.*,
729 F.3d 953 (9th Cir. 2013).............................................................................................3

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)..........................................................................................17

*Tabak v. Apple Inc.*,
2020 WL 9066153 (N.D. Cal. Jan. 30, 2020) ...............................................................11

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .....................................................................................................9

*Zango, Inc. v. Kaspersky Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009)........................................................................................21

## Statutes

47 U.S.C. § 230(a) ..................................................................................................................21

47 U.S.C. § 230(b) ..................................................................................................................21

47 U.S.C. § 230(c)(1).............................................................................................21, 23, 24, 25

47 U.S.C. § 230(c)(2)..............................................................................................................25

47 U.S.C. § 230(c)(2)(A) ........................................................................................................23

Gibson, Dunn &
Crutcher LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

When this Court dismissed plaintiffs' complaint earlier this year, it gave them specific and clear guidance on what they would need to do to establish a prima facie case.  The Court told them they would have to allege a "causal connection" between Apple's purported misrepresentations and their crypto losses and that they would have to identify the "specific statements" on which they purport to have relied.  Dkt. 46 at 3.  As to the substance of their claims, the Court told them to "allege with specificity what was false or misleading about each of the alleged misrepresentations," as required by Rule 9(b).  *Id.* at 5.

While the new complaint adds volume, it fails to add the essential details this Court spelled out in its dismissal order.  Among other things, plaintiffs once again fail to adequately allege that Apple caused their injuries; on the contrary, they double-down on their original assertion that it was the "fraudsters"—not Apple—"that carried out the . . . schemes against [p]laintiffs" and that their "money" was "stolen by the scammers."  Dkt. 49 at ¶¶ 84, 87.  And they do next to nothing to identify the specific statements on which they claim to have relied when purchasing their devices or downloading and putting money into the crypto apps in question.  They also fail to specify how any of Apple's challenged statements were false or misleading.  Plaintiffs do not identify any specific promise by Apple regarding scams like the ones to which they fell prey, so they cannot state fraud-based claims simply because Apple made statements about "security" and then the third parties who ran four apps out of the millions on the App Store scammed these plaintiffs.  Moreover, the new complaint includes allegations that trigger the bar on liability under Section 230 of the Communications Decency Act, and it adds a new negligent misrepresentation claim that runs headfirst into California's economic injury rule.

Plaintiffs have now had two bites at this apple.  They will not be able to fix these fundamental defects with another opportunity, so their claims should be dismissed with prejudice.

### II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether plaintiffs have standing to pursue their claims.

2.    Whether plaintiffs may seek equitable or injunctive relief.

3.    Whether plaintiffs have sufficiently pleaded with particularity a false or misleading

1    statement under Rule 9(b).

2    4.    Whether plaintiffs have sufficiently pleaded with particularity an actionable omission

3    under Rule 9(b).

4    5.    Whether California's economic loss doctrine precludes plaintiffs' negligent

5    misrepresentation claim.

6    5.    Whether plaintiffs' claims are barred in whole or in part by Section 230 of the

7    Communications Decency Act, 47 U.S.C. § 230.

8    **III.    FACTUAL BACKGROUND**

9    On July 8, 2025, this Court dismissed plaintiffs' claims for lack of standing and for failure to

10    satisfy Rule 9(b).  Dkt. 46 (Order).  Among other things, plaintiffs "fail[ed] to allege which specific

11    statements by Apple materially impacted [their] decision to download apps from the App Store and to

12    purchase Apple products," and they also failed to allege "which particular statements from Apple they

13    relied upon, when [they] reviewed the particular statements, and how [they] relied" on them, or "what

14    was false or misleading" about the statements.  *Id.* at 3, 5.

15    Following the dismissal of plaintiffs' complaint, the Court consolidated this action with a nearly

16    identical, later-filed action, *Shin v. Apple*, Case No. 25-cv-05000 (N.D. Cal.).  Dkt. 48.  Plaintiffs then

17    filed a consolidated amended complaint (CAC), Dkt. 49.  The core facts in the consolidated amended

18    complaint are largely unchanged from those alleged in the original complaint.  Plaintiffs joined online

19    investment groups run by "claimed financial expert[s]," such as Kevin Wilson.  CAC ¶¶ 90, 98, 107,

20    115.  Those experts "encouraged" plaintiffs to download four cryptocurrency trading apps—Digicoins,

21    SolLuna, Forex5, and Swiftcrypt—from the App Store.  *Id.* ¶¶ 91, 99, 107, 115.  Each plaintiff down-

22    loaded at least one of these apps, received an initial "seed" amount to begin trading, deposited addi-

23    tional personal funds, and later saw their accounts drained by the app developers.  *Id.* ¶¶ 91–97 (Kapil),

24    99–106 (Gomez), 107–113 (Sallen), 115–122 (Shin).  Plaintiffs acknowledge Apple did not take any

25    of their money; it was "stolen by the scammers."  *Id.* ¶ 87.  Yet, plaintiffs sued Apple for misrepresen-

26    tations it allegedly made about App Store safety and vetting.  *Id.* ¶¶ 1–9.

27    To bolster these allegations, plaintiffs now include over 15 pages purporting to detail "Apple's

28    Long-Term Trust & Safety Campaign."  *Id.* ¶¶ 25–66.  According to plaintiffs, this "consistent and

widespread campaign" included statements made by the late Steve Jobs in 2008, *id.* ¶¶ 25, 28; Apple's 2015 ad campaign, "If it's not an iPhone, it's not an iPhone," *id.* ¶ 32; a 2013 *Wired* article about consumer confidence in apps, *id.* ¶ 36; and a broad array of statements Apple makes on its website and App Review Guidelines, *e.g.*, *id.* ¶¶ 48, 59.  None of the plaintiffs allege that they relied on any specific statement before they purchased their Apple devices.  Plaintiff Shin doesn't even say when she bought her iPhone.  Plaintiffs Gomez and Shin do not identify any specific statement on which they relied before downloading the scam apps.  *Id.*  ¶¶ 102, 118.  And plaintiffs Kapil and Sallen say that before downloading the apps in question, they relied on a single App Review Guideline about crypto apps that Apple directs to app developers (not consumers) to tell them what they should do for the apps they submit.  *Id.* ¶¶ 94(3) (Kapil), 110(4) (Sallen).

Plaintiffs also add allegations that Apple "provid[ed] substantial assistance" and "material support" to the fraudsters.  *Id.* ¶ 4.  Yet, plaintiffs do not allege that Apple had any direct relationship with the fraudsters, received any of the stolen funds, or was otherwise involved in the underlying scams.  In fact, when Apple became aware of the fraudulent apps, the apps were removed and/or are no longer available on the App Store.  *Id.* ¶¶ 105 (SolLuna), 106 (Digicoins), 112 (Forex5), 122 (Swiftcrypt).

Based on these allegations, plaintiffs bring a new claim for negligent misrepresentation, *id.* ¶¶ 172–78, and continue to assert claims under California's UCL (*id.* ¶¶ 135–53) and CLRA (*id.* ¶¶ 154–71).  They seek restitution, actual damages, and injunctive relief.  CAC, Prayer for Relief.

## IV.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a court to dismiss a case for lack of subject matter jurisdiction.  "[A]n Article III federal court . . . lacks subject matter jurisdiction" where plaintiffs fail to satisfy their burden of establishing Article III standing.  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).  "In that event, the suit should be dismissed under Rule 12(b)(1)."  *Id.* at 1174.

A motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Somers v. Apple Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  Where, as here, a motion under 12(b)(1) and 12(b)(6) tests the sufficiency of the

allegations, the "district court resolves [the 12(b)(1) motion] as it would a motion to dismiss under Rule 12(b)(6)." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Claims sounding in fraud are subject to Rule 9(b)'s heightened pleading requirements and "must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citations omitted).

## V.    ARGUMENT

The consolidated amended complaint doesn't fix the defects this Court identified.  Plaintiffs still lack standing, they still have not pleaded their claims with the requisite particularity under Rule 9(b), and they still have no grounds to seek equitable relief.  Their new negligent misrepresentation claim is barred by California's economic loss doctrine.  And all their claims fail for the added reason that they seek to treat Apple as a publisher of third-party content in violation of Section 230.  These defects are incurable, so the complaint should be dismissed with prejudice.

### A.    The new complaint contains the same deficiencies the Court previously identified.

This Court dismissed plaintiffs' claims for lack of standing and for failure to satisfy Rule 9(b).  Order at 2–5.  These deficiencies remain as to the UCL and CLRA claims; they also apply equally to plaintiffs' new claim for negligent misrepresentation.  The Court also found plaintiffs had failed to plead any right to restitution or injunctive relief.  *Id.* at 3–4.  These deficiencies remain as well.

#### 1.    Plaintiffs still lack standing to assert their claims.

Plaintiffs again assert two theories of liability:  (1) they "lost thousands of dollars in scam apps" "[a]s a result of Apple's misconduct and representations," CAC ¶¶ 150, 159; and (2) they "overpaid" for their iPhones as a result of Apple's conduct, *id.* ¶¶ 97, 106, 114, 122, 168.  And again, both theories fail for lack of causation.  "To demonstrate Article III standing, a plaintiff must show an injury, trace that injury to the defendant's conduct, and prove that courts can provide redress for the injury."  Order at 2 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Similarly, to have standing to assert claims under the UCL and CLRA, and for negligent misrepresentation, a plaintiff must allege a causal connection or reliance on a specific misrepresentation or omission.  *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1012, 1015 (N.D. Cal. 2013) (actual reliance required for UCL and CLRA);

*Phillips v. Apple Inc.*, 2016 WL 1579693, at *7 (N.D. Cal. Apr. 19, 2016) (same for negligent misrepresentation).  The problem for plaintiffs is that they still concede it was the third-party fraudsters who caused them harm, not Apple, and in any case, they have "fail[ed] to allege which specific statements by Apple materially impacted [their] decision to download apps from the App Store and to purchase Apple products," as this Court required them to do.  Order at 3.

### a.     Plaintiffs confirm third parties caused them harm, not Apple.

Plaintiffs attempt again to make Apple the guarantor of their crypto losses.  *See, e.g.*, CAC ¶¶ 8, 10–13, 178.  But once again, Apple is not and cannot be the legal cause of those losses.  Plaintiffs claim now, as before, that their "money [was] stolen by the scammers." *Id.* ¶ 87.  And then they add new allegations that (1) the "fraudsters . . . carried out the pig butchering schemes against [p]laintiffs," *id.* ¶ 84; (2) plaintiffs' "assets" were "divert[ed] . . . to fraudsters," *id.* ¶ 7; and (3) "fraudsters were conducting [crypto] schemes through apps on the App Store," *id.* ¶ 175.  Indeed, plaintiffs Kapil, Gomez, and Sallen all say they lost money "in a [crypto] scam," *id.* ¶¶ 10–11, 13, and Sallen says she lost money "when [the] apps proved to be fraudulent [crypto] schemes," *id.* ¶ 12.  As the Court observed in its prior order, "[p]laintiffs acknowledge that the illegitimate cryptocurrency apps perpetrated the scams and stole from them, not Apple."  Order at 1–2.

Courts routinely reject claims like these that seek to hold a defendant responsible for the conduct of third parties.  For example, in *May v. Google LLC*, 2024 WL 4681604 (N.D. Cal. Nov. 4, 2024), the court dismissed UCL and CLRA claims alleging that Google failed to warn the plaintiff about scams involving Google gift cards, holding that she "suffered economic harm because of third-party scammers' fraudulent inducement, not Google's omission or misrepresentation."  *Id.*, at *2–3, *10–11.  Other similar cases abound.  *See, e.g.*, *In re Firearm Cases*, 126 Cal. App. 4th 959, 984–85, 992 (2005) (affirming summary judgment on UCL claim in favor of defendants because "[n]o evidence" that they "control[led] the wrongful acts" of third parties); *Pac. Select Fund v. Bank of N.Y. Mellon*, 2010 WL 11468787, at *4 (C.D. Cal. Sept. 20, 2010) (dismissing negligent misrepresentation claim because "Plaintiff's alleged losses were not the result of relying on Defendant's alleged misrepresentations, but were the result of [a third-party's] financial downfall").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Like the defendants in these cases, Apple is not the legal cause of plaintiffs' crypto losses.  There are no allegations that it controlled the acts of the fraudsters, that it had access to plaintiffs' crypto accounts, that it took any money from those accounts, or that Apple worked in concert with the scammers to steal plaintiffs' money.

### b.    Plaintiffs fail to allege Apple knew of the fraud or assisted in it.

Plaintiffs seem to suggest that Apple was somehow an aider and abettor of the scammers.  They claim Apple "assist[ed] the cyberthieves and, specifically, [crypto] scams, by telling [p]laintiffs and Class members that [the crypto] apps have been vetted and can be trusted." CAC ¶ 72.  They also say that Apple knew through "consumer complaints" that some of the apps were scams and that it failed to "remove them" promptly "once consumers complained." *Id.* ¶¶ 74–75.  But these new assertions do not state a claim for aider-and-abettor liability.

"Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person" (1) "knows the other's conduct constitutes a breach of duty"; and (2) "gives substantial assistance or encouragement to the other to so act." *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1145 (N.D. Cal. 2021) (citation omitted).  "To satisfy the knowledge element, an aider and abettor must have 'actual knowledge of the specific primary wrong the defendant substantially assisted.'" *Diaz v. Intuit, Inc.*, 2018 WL 2215790, at *6 (N.D. Cal. May 15, 2018) (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006)).  "Substantial assistance requires a significant and active, as well as a knowing participation in the wrong"—i.e., "a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Id.*, at *8 (citations and quotations omitted); *see also Barrett*, 523 F. Supp. 3d at 1145 (same).

Plaintiffs don't come close to meeting these standards.  As to knowledge, plaintiffs rely on research reports and consumer complaints.  CAC ¶ 74.  But to satisfy the knowledge prong, plaintiffs must allege the defendant had "actual knowledge of the specific primary wrong *against [p]laintiffs*." *Diaz*, 2018 WL 2215790, at *6 (cleaned up).  The research reports were issued in 2021 before plaintiffs lost money to the crypto scams; the alleged consumer complaints were lodged "prior to [p]laintiffs' downloads," CAC ¶ 74, so neither could have been about the subsequent "wrong against [p]laintiffs,"

1    *Diaz*, 2018 WL 2215790, at *6 (citation and quotations omitted).  There is also no allegation these

2    reports said anything about the apps or developers in question, or who at Apple read them, if anyone.

3    Plaintiffs' allegations are also on their face implausible.  At best, plaintiffs allege Apple had knowledge

4    of "various irregularities [that] required further investigation," *Paskenta Band of Nomlaki Indians v.*

5    *Umpqua Bank*, 846 F. App'x 589, 590 (9th Cir. 2021), but plaintiffs concede that after such

6    investigation, Apple removed the offending apps, *see, e.g.*, CAC ¶¶ 105–06, 112.

7            Plaintiffs also fail to allege that Apple substantially assisted in the crypto fraud.  They claim

8    "Apple had a duty to disclose to [p]laintiffs and Class members that the apps were not safe and should

9    not be trusted, and Apple failed to implement and maintain reasonable security procedures and practices

10   to properly vet, review, monitor and remove the fraudulent apps from its App Store."  CAC ¶ 73; *see*

11   *also id.* ¶ 72 (similar).  But "[m]ere knowledge that a tort is being committed and *the failure to prevent*

12   *it* does not constitute aiding and abetting."  *Diaz*, 2018 WL 2215790, at *8 (quoting *Fiol v. Doellstedt*,

13   50 Cal. App. 4th 1318, 1326 (1996)) (emphasis added).  That is why in *Diaz*, the court found no

14   substantial assistance even where the plaintiff alleged that Intuit "maintain[ed] deficient protocols,

15   policies and practices enabling fraud, fail[ed] to provide notice, and fail[ed] to provide data to the IRS

16   and state tax agencies."  *Id.*  Likewise, in *Barrett*, the court rejected UCL and CLRA claims seeking to

17   hold Apple liable as an aider and abettor of gift card scammers.  523 F. Supp. 3d at 1145–49.  As here,

18   the plaintiffs in *Barrett* alleged that Apple "knew or could have known" the scammers were "engag[ed]

19   in unlawful activity" and that "Apple made misleading or false statements regarding its ability to

20   respond to [such] activity."  *Id.* at 1145.  The court found these allegations insufficient to allege

21   substantial assistance because they didn't explain Apple's specific participation in the fraud:  "Plaintiffs

22   do not allege any facts indicating that Apple . . . gave any specific authorization to these accounts with

23   the knowledge and specific intent of aiding and abetting and facilitating [the] unlawful activity."  *Id.* at

24   1148 (citation and quotations omitted).  Likewise, here, Apple did not give specific authorization

25   permitting these apps to continue their scams.  Instead, plaintiffs concede that Apple followed its policy

26   of "remov[ing] from the App Store" apps that are "later discovered to violate guidelines," CAC ¶ 61;

27   that is, Apple "removed" SolLuna, *id.* ¶ 105, Digicoins, *id.* ¶ 106, and Forex5, *id.* ¶ 112, from the App

28

Store.  As for Swiftcrypt, it became "non-functional and non-responsive" in January 2025, *id.* ¶ 122, and is no longer available on the App Store.

### c. Plaintiffs still cannot plead reliance.

This Court made very clear that to show reliance, plaintiffs would need to "allege . . . *which specific statements* by Apple materially impacted [their] decision to download apps from the App Store and to purchase Apple products."  Order at 3 (emphasis added).  Plaintiffs' failure to identify the specific statements (or the omissions) is fatal because it means they cannot establish a "causal connection" between their injuries and anything Apple said or didn't say, so they lack standing.  *Id.* at 3 (citation and quotations omitted); *Phillips*, 2016 WL 1579693, at *7 (same for negligent misrepresentation).

Plaintiffs' new allegations do not move the needle on reliance.  With respect to their iPhone-overpayment theory, plaintiffs fail to identify "which specific statements by Apple materially impacted [their] decision . . . to purchase Apple products."  Order at 3.  Plaintiff Shin doesn't even tell us when she purchased her iPhone, while Kapil, Gomez, and Sallen allege they purchased their iPhones without identifying any statements on which they relied.  *See* CAC ¶¶ 95 (Kapil), 103 (Gomez), 111 (Sallen).

Plaintiffs also fail to allege reliance in connection with their downloading and transferring money into the scam apps.  To show reliance on this front, each plaintiff alleges that they viewed and relied on one or more of (a) the 2008 "There's an app for that" and the 2015 "If it's not an iPhone" ad campaigns, CAC ¶¶ 94(1) (Kapil), 102(1) (Gomez), 110(1) (Sallen), 118(1) (Shin); and (b) various unidentified "App Store website representations," *id.* ¶¶ 94(2) (Kapil), 94(3) (Gomez), 110(3) (Sallen), 118(2) (Shin).  These allegations are insufficient.

As for the ad campaigns, plaintiffs do not include *any* "specific statements," let alone any "specific statements by Apple [that] materially impacted [their] decision to download apps from the App Store."  Order at 3.  All they say is that they viewed the ad campaigns at or around the time they launched, without identifying the actual statements on which they relied.  The Court has already found conclusory allegations like these to be insufficient.  Order at 3.

Gibson, Dunn &
Crutcher LLP

NOTICE OF MOTION & MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 5:24-CV-09304-NW

As for the statements on the App Store website, while the CAC recites a variety of statements Apple has made over the last 17 years on a host of topics, plaintiffs do not specifically say which ones they relied on; instead, they claim reliance on unidentified "App Store website representations alleged above," *id.* ¶¶ 94(2), 102(3), 110(3); *see also id.* ¶ 118(2) (similar), which makes it totally unclear as to whether they relied on, for example, Apple's statement that it "is committed to security," that "100% of apps are automatically screened for malware," that "[u]nlike other mobile platforms, iOS . . . [does not] allow users to install potentially malicious unsigned apps from websites or to run untrusted apps," or something else entirely. *Id.* ¶¶ 46, 48.

This complete absence of specificity precludes plaintiffs from adequately alleging that the challenged ad campaigns or website representations were a "substantial factor" in their actions, which means they cannot "trace[] their injury to Apple's conduct." Order at 3 (citing *Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1113 (N.D. Cal. 2010)).

Plaintiffs know their reliance allegations are thin, so they double-down on the narrow exception established in *In re Tobacco II Cases*, which can excuse a plaintiff from identifying the "particular advertisements or statements" she relied on as long as she "alleges exposure to a long-term advertising campaign." *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009). Notably, plaintiffs have added over 15 pages of allegations describing Apple's purported "Long-Term Trust & Safety Campaign," in an attempt to skirt the reliance requirement. CAC ¶¶ 25–66.

Courts consider six factors to determine whether the *Tobacco II* exception applies: (1) whether the ads in the ad campaign are "similar to each other, or even identical"; (2) whether a "representative sample" of the ads is attached to the complaint; (3) whether the campaign is "sufficiently lengthy in duration"; (4) whether the "campaign is relevant" to the plaintiff's claims; (5) whether the plaintiff "actually saw or heard the defendant's ad campaign"; and (6) whether the complaint alleges "with particularity, and separately, when and how each named plaintiff was exposed to the advertising campaign." *Haskins v. Symantec Corp.*, 2014 WL 2450996, at *2 (N.D. Cal. June 2, 2014) (quoting *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1048–51 (N.D. Cal. 2014)).

The purported long-term advertising campaign fails the first four of these six factors, so the Court should not apply the exception here. *First*, the alleged long-term advertising campaign is actually

a random mish-mash of statements that bear no similarity to each other. Plaintiffs string together ad campaigns that launched in 2008 and 2015—"There's an app for that" and "If it's not an iPhone, it's not an iPhone," CAC ¶¶ 31–32—with statements made by another company (Wired) about "consumer[] confidence" in apps, *id.* ¶ 36 (citation and quotations omitted), and then add other statements Apple made on the App Store website (e.g., "Download with confidence"), *id.* ¶ 39, along with statements from the App Review Guidelines requiring app developers to have the "appropriate licensing" before offering crypto apps on the App Store, *id.* ¶ 59. These statements are not sufficiently similar to each other, some were not even made by Apple, and setting aside the two ad campaigns, "many of these statements were not even made in advertisements." *Hall v. Sea World Ent., Inc.*, 2015 WL 9659911, at *4 (S.D. Cal. Dec. 23, 2015). Plaintiffs cannot cobble together all these disjointed statements and then call it a unitary campaign. *See Opperman*, 87 F. Supp. 3d at 1052 ("insufficient detail" to conclude "alleged misrepresentations are sufficiently similar . . . to constitute a single campaign"); *Brown v. Madison Reed, Inc.*, 2022 WL 22928877, at *7 (N.D. Cal. Jan. 31, 2022) ("unclear" whether campaign was focused on "healthier hair" or "harsh chemicals").

*Second*, taking out statements that are not ads at all, as well as statements Apple did not make to consumers, the amended complaint identifies only two ad campaigns: "There's an app for that" and "If it's not an iPhone, it's not an iPhone." CAC ¶¶ 94(1) (Kapil), 102(1) (Gomez), 110(1) (Sallen), 118(1) (Shin). But plaintiffs "have not attached" "a representative sample of the advertisements at issue" to their amended complaint. *Opperman*, 87 F. Supp. 3d at 1051 (quotations omitted). Nor have they alleged the duration of either campaign. *See Brown*, 2022 WL 22928877, *7–8 (declining to apply *Tobacco II* where plaintiffs failed to allege a campaign was sufficiently lengthy in duration).

*Third*, even if plaintiffs had attached a representative sample of the ads, the exception still wouldn't apply because they do not allege how these campaigns are "relevant to this case." *Id.*, at *7. There is no allegation that these ad campaigns included any statements about cryptocurrencies, crypto apps, or crypto scams. In fact, plaintiffs allege they were exposed to these campaigns in 2008, 2009, and 2015, around the time they launched. *See, e.g.*, CAC ¶ 102(1) (Gomez stating she viewed the campaign "in or around 2009"). It is implausible that these campaigns had anything to do with plaintiffs', Apple's, or the scammers' actions in 2023 (eight to 15 years later). Notably, the only

specific statement they identify from either of these campaigns comes from the 2015 campaign, where Apple said it had "*hand-picked*" "over one and half million" "awe-inspiring, just-plain-surprising, who-knew-a-phone-could-do-that apps." *Id.* ¶ 32. But plaintiffs fail to allege "how" this statement is "misleading," especially, since it bears no connection to plaintiffs' harms. *Opperman*, 87 F. Supp. 3d at 1051. "After reading the complaint asserted against it, a defendant should be able to understand which advertising is alleged to be misleading, and how it is misleading, so that it may prepare a defense." *Id.* Apple cannot do that with the bare allegations asserted here. *Brown*, 2022 WL 22928877, at *7–8 (declining to apply *Tobacco II* exception because "I cannot determine which portion of Madison Reed's advertising campaign is relevant to this case").

### 2.    Plaintiffs fail to plead their claims with particularity under Rule 9(b).

Even if plaintiffs had standing, their claims still fail on the merits under Rule 9(b). From the outset, the CAC makes clear that this case is centered on Apple's allegedly "deliberate misrepresentations about the safety and trustworthiness of its App Store." CAC ¶ 1. As such, plaintiffs' claims, including their new claim for negligent misrepresentation, "all sound in fraud" and are "subject to Rule 9(b)'s heightened pleading standard." Order at 4 (quoting *Kearns*, 567 F.3d at 1124). This means that the "entire complaint must . . . be pleaded with particularity" under Rule 9(b), including "the who, what, when, where, and how of the misconduct charged." *Kearns*, 567 F.3d at 1127–28 (citations and quotations omitted); *see also Dey v. Robinhood Mkts.*, 780 F. Supp. 3d 882, 891 (N.D. Cal. 2025) (negligent misrepresentation claim is subject to Rule 9(b)). Plaintiffs fail to meet this demanding standard because they do not identify with particularity what specific statements they relied on, how they relied on them, or what was false or misleading about *any* of the statements cited in the complaint. *See Kearns*, 567 F.3d at 1127–28 (affirming dismissal of UCL and CLRA claims under Rule 9(b)); *see also Rutter v. Apple Inc.*, 2022 WL 1443336, at *9 (N.D. Cal. May 6, 2022) (similar). And to the extent plaintiffs claim they relied on Apple's omissions—i.e., its failure to "disclose[] the true nature of the misrepresentations at issue," CAC ¶¶ 150, 178—those claims are at best "general allegations of concealment" and also fail under Rule 9(b), *Tabak v. Apple Inc.*, 2020 WL 9066153, at *9 (N.D. Cal. Jan. 30, 2020).

Because plaintiffs fail to plead reliance as a threshold matter for purposes of standing, they necessarily fail to plead with particularity the "what" or "how" of their alleged reliance on the challenged Apple statements. *See supra* § V.A.1.c. They have failed to "tie specific statements to each [p]laintiff and to the claims and harm [p]laintiffs allege in the complaint," and their claims should again be dismissed. Order at 5 (discussing whether plaintiffs have adequately stated a claim).

They also fail to plead with particularity any false or misleading statement. The CAC identifies several categories of statements by Apple about the App Store or iPhone that were allegedly false or misleading, including (1) statements about the App Store published on Apple.com, *see* CAC ¶¶ 6, 47–48, 50–51, Ex. A; (2) statements in articles and reports that Apple has published about App Store security, *see id.* ¶¶ 26, 40–46, 61–62; (3) the App Review Guidelines, *see id.* ¶¶ 57–61, Ex. B (available at https://developer.apple.com/app-store/review/guidelines/); and (4) statements in two television ad campaigns, *see id.* ¶¶ 30, 32. But plaintiffs have not pleaded with particularity "what [was] false or misleading" about these alleged statements, so none of them can support a claim under Rule 9(b). *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 558−59 (N.D. Cal. 2019) (dismissing UCL claim where plaintiffs failed to plead what was false or misleading about Apple's "rigorous testing methods" statements and why they were false); *Diep v. Apple Inc.*, 2024 WL 1299995, at *3 (9th Cir. Mar. 27, 2024) (affirming dismissal of UCL and CLRA claims because plaintiffs "do not explain why [the] statements would be misleading to a reasonable consumer"). Nor could they, as each of the plaintiffs alleges their trust for apps on the App Store was "confirmed" by their positive experiences using Apple products for more than a decade. *See, e.g.*, CAC ¶¶ 92 (Kapil), 100 (Gomez), 108 (Sallen), 116 (Shin).

While the CAC devotes several pages to documenting various statements by Apple, plaintiffs spend a total of four paragraphs (spanning barely more than half a page) trying to show how those challenged statements were false or misleading. *See id.* ¶¶ 63–66. The only supporting factual allegation they put forth is that Apple "approved and then allowed [the scam apps] to remain available on the App Store." *Id.* ¶ 63. Thus, plaintiffs' theory is that Apple's statements were false or misleading simply because four scam apps made it onto the App Store and were not removed before plaintiffs fell victim to scams perpetrated by Kevin Wilson and others. But the only way the mere presence of four bad apps on the App Store (out of the "nearly two million apps" available, *id.* ¶ 40) could render

Apple's statements false or misleading would be if Apple had promised to stop 100% of all fraudulent apps from ever reaching the App Store.  Plaintiffs do not claim Apple made any such promise.

Start with the statements on Apple.com:

- "The apps you love.  From a place you can trust."
- "For over a decade, the App Store has proved to be a safe and trusted place to discover and download apps."
- "Privacy and security.  Built into everything we do."
- "Committed to security."
- "We conduct a thorough review to check that apps come from known sources, are free of known malware, and haven't been tampered with at the time of installation or launch."
- "100% of apps are automatically screened for known malware."
- "Dedicated to trust and safety."
- "Apps must adhere to our guidelines."
- "Every week, nearly 500 dedicated experts around the world review over 130k apps."
- "In 2024, more than 1.9 million submissions were rejected for reasons that include privacy violations and fraudulent activity."
- "Download with confidence."
- "Purchase safely and securely."
- "App Store purchases are safe and simple … Need a refund?  Apple Support has your back."

CAC ¶ 48 (quotations omitted); *see also id.* ¶¶ 6, 47, 50–51.  None of these statements promise a specific (let alone perfect) level of security.  And several of these statements are value statements to consumers about Apple's priorities as a company and for the App Store in particular, e.g., that Apple is "[c]ommitted to security," *id.* ¶ 48; these are not the type of "specific and measurable claim[s], capable of being proved false or of being reasonably interpreted as a statement of objective fact," that can support a misrepresentation theory, *Ahern*, 411 F. Supp. 3d at 554–55 (quoting *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1039 (N.D. Cal. 2014)).  Plaintiffs also do not "allege with specificity what was false or misleading" about any of these statements, Order at 5—e.g., plaintiffs do not allege any of Apple's statements about the number of apps it reviews or rejects were inaccurate, that Apple doesn't actually scan apps for known malware, or that Apple is not indeed committed to privacy and security.

The same is true for the various Apple-published articles and reports.  Plaintiffs challenge (1) "Building a Trusted Ecosystem for Millions of Apps: The important role of App Store Protections"

1   ("*Building 1*"), CAC ¶¶ 40, 62 (available at https://www.apple.com/privacy/docs/Building_a_

2   Trusted_Ecosystem_for_Millions_of_Apps.pdf); (2) "Building a Trusted Ecosystem for Millions of

3   Apps: A Threat Analysis of Sideloading" ("*Building 2*"), *id.* ¶ 26 (available at https://www.apple

4   .com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_Apps_A_Threat_Analysis_of_S

5   ideloading.pdf); (3) the "About App Store Security" section of Apple's "Platform Security" manual

6   ("*Platform Security*"), *id.* ¶¶ 44–46, 61 (available at https://help.apple.com/pdf/security/en_US/apple-

7   platform-security-guide.pdf); and (4) three reports discussing Apple's efforts to prevent App Store

8   fraud (the 2021, 2024 and 2025 "Fraud Reports"), *id.* ¶¶ 41–43 (available at

9   https://www.apple.com/newsroom/2022/06/app-store-stopped-nearly-one-point-five-billion-in-fraud

10  ulent-transactions-in-2021/; https://www.apple.com/newsroom/2024/05/app-store-stopped-over-7-

11  billion-usd-in-potentially-fraudulent-transactions/; and https://www.apple.com/newsroom/2025/05

12  /the-app-store-prevented-more-than-9-billion-usd-in-fraudulent-transactions/). Insofar as these

13  materials contain actionable factual assertions, *see Ahern*, 411 F. Supp. 3d at 554–55, plaintiffs do not

14  allege what is false or misleading about any of them.

15          For instance, plaintiffs do not allege that Apple fails to "review every single app and each app

16  update to evaluate whether they meet [Apple's] high standards," CAC ¶ 40 (quoting *Building 1*), or

17  that Apple, contrary to what it states in *Platform Security*, "allow[s] users to install potentially

18  malicious unsigned apps from websites or to run untrusted apps," permits anyone other than "identified

19  developers who have agreed to follow Apple guidelines" to list apps on the App Store, or ever lets an

20  app onto the App Store without the app first "pass[ing] automated and human review," *id.* ¶¶ 45, 46.

21  They also do not allege that any of the factual statements in Apple's Fraud Reports, including that

22  Apple has *prevented* billions of dollars in fraud through its security measures, were false or misleading.

23  And even if Apple approved the scam crypto apps and didn't remove them fast enough to prevent

24  plaintiffs from falling victim to the scammers, that would not render false or misleading any of Apple's

25  statements, i.e., it would not demonstrate that Apple fails to review every single app or app update or

26  otherwise failed to apply its security measures. *See Davidson v. Apple Inc.*, 2017 WL 3149305, at *12

27  (N.D. Cal. July 25, 2017) ("It is not false to represent the iPhone has titanium inserts when it in fact

28  has them, even if those titanium inserts may fail." (cleaned up)). It would just mean that those measures

do not prevent 100% of all fraud in the first instance, which plaintiffs do not allege Apple promised. *See* CAC ¶ 61 (apps may "make[] it into the App Store" and "later discovered to violate guidelines").

In fact, the cited materials reveal a far more nuanced and transparent discussion by Apple about App Store security.  For example, in *Platform Security*, Apple notes that its security processes "limit the damage malicious apps can inflict" and "make[] it harder for [malicious apps] to get on users' devices in the first place," but warns that its protections "aren't engineered to protect against choices a user might be tricked into making"—exactly what happened here—and that "App Store security measures alone can never be perfect."  *Platform Security* at 133–34.  Similarly, the Fraud Reports openly discuss how bad actors, like the scammers here, often take measures to circumvent Apple's App Review protections by disguising the true nature of their apps, such that Apple is sometimes able to discover their malicious nature only after the app has been approved.  *See* 2021 Fraud Report (noting that in 2021 "over 155,000 apps were removed from the App Store" for circumventing App Review protections); 2024 Fraud Report (Apple "removed or rejected 40,000 apps from developers who engaged in bait-and-switch activity" in 2023); 2025 Fraud Report (similar).  Apple also says in *Building 1* that its "App Review processes do not prevent the distribution of every single low-quality app" and that Apple is "contin[uing] to innovate and improve its technology, practices, and promises."  *Building 1* at 12; *Building 2* at 22 (similar).  In the face of these nuanced and highly transparent statements about the strengths and limits of App Review, no reasonable consumer could view Apple as having promised to prevent 100% of all fraud that an app developer might carry out once they get their app on the App Store.  *See Moore v. Trader Joe's Co.*, 4 F.4th 874, 883−84 (9th Cir. 2021) (no deceit considering broader context); *Ebner v. Fresh, Inc.*, 838 F.3d 958, 967 (9th Cir. 2016) (same).

Plaintiffs' allegations about the App Review Guidelines fare no better.  The Guidelines are standards that app developers are told to comply with to offer an app on the App Store.  That is, they tell app developers what Apple expects of them before their apps can be made available, and under what circumstances the apps may be removed.  These are "promise[s]" that app developers make to Apple "in exchange for participation" in Apple's App Store program.  *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1201 (N.D. Cal. 2009).  The Guidelines are not an "agreement contain[ing] any promise *by [Apple]*" to consumers "to enforce its terms . . . or otherwise to remove noncompliant [apps]."  *Id.*

Gibson, Dunn &
Crutcher LLP

(Google's advertising terms not actionable because they did not contain any promises to consumers). Moreover, no Guideline promises 100% security against fraudulent or malicious apps. What they say is that "[a]pps that attempt to scam users will be removed from the App Store," App Review Guidelines 3.1.2(a), 5.6, which is what happened here when Apple discovered the fraud, *see* CAC ¶¶ 105–06, 112, 122. *See also id.* ¶ 61 (Apple Support article stating apps will be "removed" if "later discovered" to be engaged in "fraud and malicious activity"). Plaintiffs also assert that the apps "had no proper licensing," purportedly in violation of the Guidelines. *Id.* ¶¶ 66, 74. Setting aside that the Guidelines aren't guarantees to consumers like plaintiffs, the assertion also fails Rule 9(b) because plaintiffs do not identify what, if any, licensing was "proper," and how these apps supposedly fell short.

Plaintiffs also challenge two television ad campaigns: the "There's an app for that" campaign, *id.* ¶ 30, and the "If it's not an iPhone, it's not an iPhone" campaign, *id.* ¶ 32. As is clear from their names, both were about the variety of apps available on the App Store and the unique benefits that iPhones provide to consumers; neither said anything about App Store security. But even accepting plaintiffs' contention that these campaigns "encourag[ed] consumers to equate Apple's approval of an app with trustworthiness and safety," *id.* ¶ 31, and delivered the message "that only Apple could deliver a secure, thoroughly vetted library of applications," *id.* ¶ 32, the promotion of such a sentiment does not constitute a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact," *Ahern*, 411 F. Supp. 3d at 554–55.

In the end, what plaintiffs' theory requires, and what their CAC fails to allege, is a promise by Apple that App Store security is perfect and that it will weed out all scammers before scams occur. Without such representations, plaintiffs' claims fail to satisfy Rule 9(b) (or Rule 8 for that matter). For example, in *In re Iphone 4S Consumer Litig.*, 2014 WL 589388 (N.D. Cal. Feb. 14, 2014), *aff'd sub nom.*, 637 F. App'x 414 (9th Cir. 2016), the court dismissed CLRA, UCL, and negligent misrepresentation claims (among others) predicated on alleged misrepresentations by Apple about the iPhone's Siri feature. 2014 WL 589388, at *8–9. The plaintiffs there alleged that Siri did not consistently perform the tasks it had executed in Apple's marketing materials. *Id.*, at *5. The court held that such allegations were insufficient under Rules 8 and 9(b) absent an allegation that Apple had "expressly indicate[d] that Siri would be able to answer every question" or "would operate without

fail," which the plaintiffs had not alleged, just as plaintiffs here have not alleged any promise by Apple to provide perfect App Store security. *Id.*, at *6–7; *see also In re iPhone 4s Consumer Litig.*, 637 F. App'x at 415–16 (affirming dismissal, explaining that the plaintiffs "fail[ed] to define what level of consistency they expected from [Apple's] representations and how often Siri actually performed as requested" and thus, "failed to adequately allege why the representations were misleading"). Likewise, in *Minkler v. Apple Inc.*, 65 F. Supp. 3d 810 (N.D. Cal. 2014), the court dismissed the plaintiffs' CLRA, UCL, and negligent misrepresentation claims premised on Apple's statements about Apple Maps because although the plaintiffs had alleged that Apple Maps did not work every time, they "failed to identify any specific statements by Apple that expressly indicate[d] that Apple Maps would always work flawlessly and without error." *Id.* at 821.

### 3. Plaintiffs are not entitled to restitution or injunctive relief.

Plaintiffs again are not entitled to restitution or injunctive relief under the UCL and CLRA. *See, e.g.*, CAC ¶¶ 152–53 (restitution and injunction under UCL), 168–69 (same under CLRA).

*First*, plaintiffs' claims for equitable relief fail because they have not pleaded that they lack "an adequate remedy at law" as required by *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Here, plaintiffs argue that "any legal remedy that does exist . . . is not equally prompt, certain, and in other ways efficient as the equitable remedies proposed, including because" (1) Apple may have "one or more legal defenses unavailable under [p]laintiffs' theory under the UCL" and (2) their claims for legal damages may "impose more stringent elements than the UCL." CAC ¶ 152. But just because a plaintiff's "legal claims have different elements that are harder to prove and require additional showings of proof compared to his equitable restitution claims" "do not make [the] legal remedy inadequate." *King v. Nat'l Gen. Ins. Co.*, 2025 WL 2494366, at *7 (N.D. Cal. Aug. 29, 2025) (citation and quotations omitted). Here, plaintiffs' claim for "actual damages" under the CLRA, CAC ¶ 167, is "predicated on the same conduct as [their] claims for equitable relief" under the UCL and CLRA, *Ibarra v. Pharmagenics LLC*, 660 F. Supp. 3d 914, 922–23 (C.D. Cal. 2023); *see* CAC ¶¶ 153, 168. And yet, they "fail[] to explain how the same amount of money for the exact same harm[s] is inadequate or incomplete." *Sonner*, 971 F.3d at 844. Accordingly, as in *Sonner*, the claims for restitution must

be dismissed.  *Id.*; *see, e.g.*, *Scheibe v. Esupplements, LLC*, 681 F. Supp. 3d 1101, 1109–10 (S.D. Cal. 2023) (dismissing claims for equitable relief under UCL and CLRA where plaintiffs claimed actual damages under CLRA); *Price v. Apple Inc.*, 2022 WL 1032472, at *7 (N.D. Cal. Apr. 6, 2022) (similar).

The same holds true for plaintiffs' requests for injunctive relief.  *See, e.g.*, CAC ¶¶ 151 (UCL), 166 (CLRA).  They contend that "corrective advertising" is "necessary to dispel public perception about the safety and trustworthiness of apps in Apple's App Store."  *Id.*  But "there is no reason to think legal remedies, like damages, will not be sufficient to make [these] plaintiffs whole."  *Drake v. Toyota Motor Corp.*, 2021 WL 2024860, at *7 (C.D. Cal. May 17, 2021).  If these plaintiffs or others are scammed again by crypto apps, their legal damages will be the amounts stolen by the scammers and/or the amounts they overpaid for their iPhones, one or both of which will make them "whole."  *Id.*

*Second*, plaintiffs cannot claim restitution for their crypto losses because they have failed to allege (1) "that they paid Apple to download the cryptocurrency apps"; or (2) "that Apple acquired . . . [p]laintiffs' money that was stolen through the cryptocurrency scam."  Order at 4.  Nowhere do plaintiffs allege they paid Apple anything to download the apps.  And nowhere do they allege Apple acquired any of the money they lost on the apps.  In fact, they allege the exact opposite: their "money" was "stolen by the scammers," CAC ¶ 87, and their "assets" were "divert[ed] . . . to fraudsters," *id.* ¶ 7.

As to their theory that they overpaid for their iPhones, only plaintiffs Kapil and Shin allege they purchased their iPhones "from Apple."  *Id.* ¶¶ 95, 116.  Plaintiffs Gomez and Sallen bought their phones from Sprint and Verizon.  *Id.* ¶¶ 103, 111.  They further allege that "Apple sells iPhones in large volumes to major carriers" like Sprint and Verizon "at wholesale prices" and that while "carriers . . . resell the devices to consumers," "Apple collects full payment of the wholesale price from carriers upon delivery."  *Id.* ¶ 103 n.79.  These allegations confirm that Apple did not acquire any of the money that plaintiffs Gomez and Sallen paid to their carriers, so their restitution claims fail.  Order at 4.

*Third*, plaintiffs lack standing to pursue their claims for injunctive relief because they fail again to allege an imminent threat of future injury.  Even if they had standing, the offending apps they used are no longer available on the App Store, and so no injunction could provide them any redress.

This Court recognized that to seek injunctive relief, plaintiffs would have to allege they faced a "real or immediate threat" that they would be wronged again in a similar way.  Order at 3 (citation

18

Gibson, Dunn & Crutcher LLP

1    and quotations omitted). To do so in this case, this Court said they would need to plead their "intent[]

2    to download additional apps from Apple or purchase additional devices." *Id.* There is not a single

3    allegation in the amended complaint that plaintiffs intend to "purchase additional [Apple] devices," so

4    any injunction related to iPhones or other Apple devices should fail. *Id.*

5         As for their intent to download additional apps, plaintiffs say again that they "intend to continue

6    to purchase App Store apps" but now add the allegation that they cannot do so "safely" "without

7    subjecting themselves to other financial scams." *Compare* Dkt. 1, ¶ 82, *with* CAC ¶ 151. This new

8    allegation purports to take advantage of *Davidson v. Kimberly-Clark Corporation*, 889 F.3d 956 (9th

9    Cir. 2018), where the Ninth Circuit held that previously deceived consumers "may" still have standing

10   to seek an injunction if they can show either (1) they "would like to" purchase the product or service

11   in the future but will not because they are unable to rely on the advertising; or (2) they "might purchase

12   the production the future," while assuming incorrectly that the product had been improved. *Id.* at 969–

13   70. But here, plaintiffs cannot even download again the four scam apps at issue because they are no

14   longer available on the App Store. There is thus no threat that they will download the apps on accident

15   thinking they had been improved. Neither of the *Davidson* scenarios applies.

16        Moreover, to the extent plaintiffs seek an injunction based on *other* "App Store apps," including

17   other "financial apps," this effort fails. CAC ¶ 151. Plaintiffs have not alleged that they downloaded

18   any other financial apps that turned out to be scams. The law is clear that "[a] plaintiff who is falsely

19   led to buy a product may claim injury resulting from *that purchase*; the same plaintiff, however, cannot

20   claim injury from similarly false advertising upon which he or she did not injuriously rely (by buying

21   a similar product or otherwise)." *Lorentzen v. Kroger Co.*, 532 F. Supp. 3d 901, 909 (C.D. Cal. 2021)

22   (emphasis added). Courts routinely dismiss claims for lack of standing where the plaintiffs have failed

23   to allege that they purchased the offending product. *See, e.g.*, *Oh v. Fresh Bellies, Inc.*, 2024 WL

24   4500727, at *4 (C.D. Cal. Oct. 15, 2024) ("Plaintiff has not shown that another's purchase of a different

25   variation of the Product, although similar, is an invasion of her own legally protected interest." (cleaned

26   up)); *Ringler v. J.M. Smucker Co.*, 783 F. Supp. 3d 1229, 1246 (C.D. Cal. 2025) (similar).

27        Even if such a claim for injunctive relief were cognizable, it would still fail because plaintiffs'

28   general intent to download and use some unspecified apps at some unspecified time in the future is not

Gibson, Dunn &
Crutcher LLP

1   enough to show a "real or immediate threat" of harm.  Order at 3 (citation and quotations omitted).

2   Without more, plaintiffs' allegations are "'some day' intentions" "without any description of concrete

3   plans, or indeed even any specification of *when* the some day will be" and "do not support a finding of

4   the 'actual or imminent' injury" required for an injunction.  *Lujan*, 504 U.S. at 564.

5           Finally, plaintiffs cannot claim injunctive relief because the injunction they seek—prohibiting

6   Apple from violating the law, enjoining it from failing to vet apps, and for corrective advertising, *see,*

7   *e.g.*, CAC ¶¶ 151, 166, 169, Prayer for Relief, ¶ C—would not redress their injuries.  Apple has not

8   committed any violations of law.  *See supra* §§ V.A.1–2; *infra* §§ V.B–C.  Plaintiffs admit that Apple

9   removed the offending apps from the App Store in line with its policies saying it would do so.  "No

10  injunction could therefore re-dress any potential injury [to plaintiffs], and that lack of redressability

11  defeats standing."  *Conrad v. Boiron, Inc.*, 869 F.3d 536, 542 (7th Cir. 2017); *see also Greenstein v.*

12  *Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1232 (N.D. Cal. 2022) (similar).

13          **B.      The negligent misrepresentation claim is barred by the economic loss doctrine.**

14          Plaintiffs' negligent misrepresentation fails for the reasons discussed above—no standing, and

15  no false or misleading statement under Rule 9(b).  This new claim also fails for the independent reason

16  that plaintiffs "plead[] only economic harm" in violation of the economic loss rule.  *Michael v. Honest*

17  *Co.*, 2016 WL 8902574, at *23 (C.D. Cal. Dec. 6, 2016).  "The economic loss rule [in California]

18  requires a purchaser to recover in contract for purely economic loss due to disappointed expectations,

19  unless he can demonstrate harm above and beyond a broken contractual promise."  *Id.* (quoting

20  *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004)).  To demonstrate such harm,

21  a plaintiff must allege "(1) personal injury, (2) physical damage to property, (3) a special relationship

22  between the parties, or (4) some other common law exception."  *Kalitta Air, L.L.C. v. Central Tex.*

23  *Airborne Sys., Inc.*, 315 F. App'x 603, 605 (9th Cir. 2008).  Negligent misrepresentation claims that

24  seek only economic relief should thus be dismissed.  *See Michael*, 2016 WL 8902574, at *23–24;

25  *Minkler*, 65 F. Supp. 3d at 820 (same).  Here, plaintiffs claim that as a result of Apple's alleged

26  negligent misrepresentations, they "have lost money and property" related to the amounts they "paid"

27  for their Apple devices and the money they lost to the scam apps.  CAC ¶ 178.  This is all purely

28

economic loss; recovery in tort is foreclosed. Plaintiffs do not allege they were personally injured, that their iPhones were physically damaged, or any common law exception to the economic loss rule. As to a special relationship, the complaint does "not allege more than a relationship . . . that is an 'everyday consumer transaction.'" *Michael*, 2016 WL 8902574, at *24.

### C. Section 230 of the Communications Decency Act bars all of plaintiffs' claims.

Plaintiffs' real grievance seems to be that Apple fostered consumer confidence through ongoing efforts to ensure security and privacy in its App Store and, as a result, Apple should have done more to protect plaintiffs from the fraudulent cryptocurrency apps it published. Such claims fall squarely within the bar of Section 230(c) of the CDA, 47 U.S.C. § 230.

### 1. All of plaintiffs' claims derive from Apple's status as a publisher.

Section 230(c)(1) broadly immunizes providers of interactive computer services from liability for content posted by third parties. *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096–97 (9th Cir. 2019); *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (CDA provides "broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." (cleaned up)). Congress enacted the CDA for "two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003); *see also* 47 U.S.C. § 230(a), (b). To promote those purposes, Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be" held liable "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). That includes any claim that "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009). And as relevant here, immunity covers "business torts," including "state unfair competition and false advertising actions." *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 (9th Cir. 2009). "[W]hat matters is not the name of the cause of action." *Barnes*, 570 F.3d at 1101. "[W]hat matters" instead is "whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher,'" and its

Gibson, Dunn &
Crutcher LLP

"traditional editorial functions" such as "deciding whether to publish, withdraw, postpone or alter" third-party content. *Id*. at 1101–02 (citation and quotations omitted).

To assess whether Section 230 immunity applies, the Ninth Circuit has adopted the following three-prong test:  "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider." *Id.* at 1100–01.  Each element is established here since plaintiffs seek to hold Apple liable for content developed by third parties—the fraudulent crypto apps—simply because Apple made those apps available on its App Store.

*First*, Apple provides an "interactive computer service" (the App Store) as courts have uniformly held.  *See, e.g.*, *Doe v. Apple Inc.*, 2025 WL 1266928, at *3 (N.D. Cal. May 1, 2025); *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 993 (N.D. Cal. 2022).

*Second*, plaintiffs expressly advance a publisher theory of liability.  A claim treats a defendant as a publisher of third-party content when liability derives from publishing activity and "depend[s] on" the wrongfulness of the content "without which no liability could have existed." *Lemmon v. Snap Inc.*, 995 F.3d 1085, 1094 (9th Cir. 2021).  Courts need to "examine closely the duty underlying each cause of action and decide if it 'derives from the defendant's status or conduct as a publisher.'" *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1179 (9th Cir. 2024) (quoting *Barnes*, 570 F.3d at 1107).  Absent some separate obligation, such as promise, Section 230 precludes claims that would require a defendant to undertake an ongoing duty to remove or "moderate content to fulfill its duty" as those claims necessarily depend on the wrongfulness of the third-party content. *Id.* at 1177; *see also Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (Section 230 bars claims that would require an online service "to remove any user content or otherwise affect how it publishes or monitors such content.").  In such cases, immunity attaches unless plaintiffs show that defendant's alleged duty could "have been satisfied without changes to the content posted by the website's users and without conducting a detailed investigation." *Internet Brands*, 824 F.3d at 851.

The claims here derive from Apple's status as the publisher of the scam crypto apps.  Plaintiffs allege that Apple maintains exclusive control over the App Store and "curate[s]" the selection of apps it makes available for download on its platform.  CAC ¶ 1; *see also id.* ¶¶ 25–27, 31–32, 39, 58, 62,

22

73, 94, 142. They also allege that the scam apps at issue were developed by third parties and presented to Apple for publication on the App Store, but that "Apple failed to implement and maintain reasonable security procedures and practices to properly vet, review, monitor and remove the fraudulent apps," and that it "allowed" these "fraudulent apps" "to remain available on the App Store." *Id.* ¶¶ 49, 63, 73. And each of plaintiffs' claims derives specifically from Apple's alleged failure "to adequately vet predatory, potentially devastating . . . cryptocurrency scam apps and make them available to download." *Id.* ¶ 139 (Count I); *see also id.* ¶¶ 169, 174–75 (similar for Counts II and III).

These allegations mirror those in *Diep v. Apple Inc.*, where the plaintiffs also sued Apple "for injuries caused by a malicious application . . . that they downloaded from Apple's App Store." 2024 WL 1299995, at *1. As here, the plaintiffs brought various claims, including negligence, alleging "Apple's authorization, monitoring, or failure to remove [the offending app] from the App Store" caused them injury. *Id.*, at *1. But the Ninth Circuit held "liability" based on these allegations was "barred by section 230(c)(1)" "[b]ecause these are quintessential 'publication decisions.'" *Id.* (quoting *Barnes*, 570 F.3d at 1105). Here, plaintiffs seek to hold Apple liable for the exact conduct the Ninth Circuit in *Diep* said was not actionable because of Section 230(c)(1). *Id.*; *see also Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc) (similar); 47 U.S.C. § 230(c)(1), (2)(A).

Plaintiffs attempt to plead around Section 230 by alleging that Apple is liable for its own misrepresentations about the safety and security of its App Store. But even under plaintiffs' view, those alleged misrepresentations only matter because the crypto apps at issue were published in the App Store. There is only an alleged harm, and an alleged claim by plaintiffs, because of the publications at issue. If accepted, plaintiffs' position would allow any "clever lawyer" to creatively circumvent Section 230 and nullify its protections. *Roommates.com*, 521 F.3d at 1174; *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265–66 (9th Cir. 2016). That's why the Ninth Circuit instructs courts to analyze whether the duty, in fact, "spring[s] from some other obligation, such as a promise," or if it "stem[s] from the platform's status as a publisher." *Est. of Bride*, 112 F.4th at 1177. As explained above, *supra* § V.A.2., plaintiffs fail to identify any actionable statement that creates an independent duty to engage in more extensive vetting and monitoring.

1   *Barnes* is instructive.  There, plaintiff brought a state-law tort claim against Yahoo for negligent

2   undertaking based on its failure to take down a profile falsely claiming to belong to the plaintiff, despite

3   the plaintiff's repeated requests.  *Barnes*, 570 F.3d at 1098–99, 1102.  The plaintiff argued the "claim

4   would not treat Yahoo as a publisher."  *Id.* at 1102.  Rather, the plaintiff acknowledged that while

5   "Yahoo may have had no initial responsibility to act, once Yahoo, through its agent, undertook to act,

6   it must do so reasonably."  *Id.* at 1102 (cleaned up).  But the Ninth Circuit rejected this argument,

7   affirming that a plaintiff cannot "escape section 230(c) by labeling as a negligent undertaking an action"

8   that seeks to hold a website operator liable for publishing activity.  *Id.* at 1102–03 (cleaned up).

9   Similarly, it matters not whether plaintiffs referred to their claims as a negligent undertaking,

10  unfair competition, negligent misrepresentation, or fraud.  *See Goddard*, 640 F. Supp. 2d at 1201.  None

11  of the claims derive from an independent obligation, such as a promise Apple made to consumers.

12  *Supra* § V.A.2.  The statements that come closest to establishing a purported promise are found in

13  Apple's general monitoring policy.  But courts repeatedly reject the argument that such a policy

14  amounts to an enforceable promise, at least one that Apple makes to consumers.  *See, e.g.*, *Barnes*, 570

15  F.3d at 1108; *see also Goddard*, 640 F. Supp. 2d at 1201.

16  Even more telling is the relief plaintiffs seek—which clearly seeks to hold Apple liable as a

17  publisher.  They want this Court to issue an injunction to preclude Apple from publishing these

18  fraudulent apps in the future; and absent such an injunction, plaintiffs, who intend to continue using

19  Apple devices, say they "will not know whether the App Store apps, and especially its financial apps,

20  are safe, vetted, and legitimate."  CAC ¶¶ 151, 166; *see also id.* ¶ 169 ("Plaintiffs seek an order

21  enjoining Apple . . . from its ongoing violations of the CLRA and ongoing failure to vet the safety,

22  security and legitimacy of cryptocurrency trading apps available on the App Store[.]").  Such relief

23  cannot be imposed, nor can Apple satisfy its duty, "without changes to the content posted by the

24  website's users and without conducting a detailed investigation."  *Internet Brands*, 824 F.3d at 851.

25  "[H]owever imperfect" Apple's vetting process "proves to be," it is not a basis by which plaintiffs can

26  hold Apple liable.  *Est. of Bride*, 112 F.4th at 1175–76.  Thus, Section 230 bars all of plaintiffs' claims.

27  *Third*, the apps at issue are "information provided by another information content provider."

28  47 U.S.C. § 230(c)(1).  Plaintiffs admit that independent third parties—not Apple—created the scam

24

apps that stole their money.  *See* CAC ¶ 7.  As explained above, *supra* § V.A.1.b., plaintiffs attempt to hold Apple independently responsible for the content of those apps by alleging that Apple "knowing[ly] participat[ed]" in and "provid[ed] substantial assistance that enabled cybercriminals to defraud consumers through the App Store."  CAC ¶ 4.  But plaintiffs do not "allege[] enough facts . . . to infer" Apple's vetting or monitoring procedures "were designed to facilitate" these scam apps.  *Dyroff*, 934 F.3d at 1100.  Plaintiffs' theory is just that Apple failed to identify the scams in the first instance.  But these allegations are conclusory and contradicted by other allegations.  *See* CAC ¶¶ 77–78 nn. 59, 60. Notably, plaintiffs cite and rely on articles that explain how scam crypto apps evade Apple and other platforms' initial vetting procedures by masquerading as benign apps, like a QR code scanner or data tracker.  *Id.*  The Court therefore should not accept as true allegations that seek to imply Apple never vetted such apps, or it vetted such apps and published them anyway.  *See Alamilla v. Hain Celestial Grp.*, 30 F. Supp. 3d 943, 944 (N.D. Cal. 2014).

### 2.    Apple is not liable for its good-faith efforts to monitor third-party content.

Even if Section 230(c)(1) does not apply to some of the challenged content, such as the advertisements and marketing campaigns, generated by Apple, "Subsection 230(c)(2), for its part, provides an additional shield from liability."  *Barnes*, 570 F.3d at 1105.  Subsection (c)(2) applies to "*any* provider of an interactive computer service" and immunizes "any action voluntarily taken in good faith to restrict access to or availability of material that the provider . . . considers to be . . . otherwise objectionable."  *Id.* (citing 47 U.S.C. § 230(c)(2)).  None of plaintiffs' allegations sufficiently alleges that Apple vetted its apps or marketed its security initiatives in bad faith to mislead customers into downloading and using fraudulent apps.  Thus, it would contravene the purpose of the CDA to conclude that Apple is more liable for engaging in voluntary, good-faith monitoring than it would have been had it not undertaken any of its significant efforts to monitor harmful content.

## VI.    CONCLUSION

For these reasons, the Court should dismiss the CAC with prejudice.  Plaintiffs already had an opportunity to amend but failed to cure the deficiencies this Court identified.  Further amendment would almost certainly be futile given Section 230's categorical prohibition.

1    Dated:  September 29, 2025                    GIBSON, DUNN & CRUTCHER LLP

2

3                                      */s/ Kahn A. Scolnick*

4                                        Kahn A. Scolnick

                                        *Attorney for Defendant Apple Inc.*

NOTICE OF MOTION & MOTION TO DISMISS CONSOLIDATED FIRST AMENDED COMPLAINT
CASE NO. 5:24-CV-09304-NW